## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

CALVIN ALPHONSO SHULER,          )       Civil Action No. 3:05-1595-MBS-JRM
SK #5064,                        )
                                 )
                Petitioner,      )
                                 )
        vs.                      )
                                 )
JON E. OZMINT, Commissioner,     )
South Carolina Department of     )       **REPORT AND RECOMMENDATION**
Corrections, and HENRY McMASTER, )
Attorney General, State of South Carolina, )
                                 )
                Respondents.     )
————————————————————————         )

Petitioner, Calvin Alphonso Shuler ("Shuler"), is an inmate at the South Carolina

Department of Corrections ("SCDC"). He is under a sentence of death for a murder committed

during an armed robbery and kidnapping. He filed a petition for a writ of habeas corpus in this

court on August 4, 2005.[1] Respondents, the Commissioner of SCDC and the Attorney General

of South Carolina, filed a return and motion for summary judgment on August 12, 2005. Their

motion is supported by the state court record[2] and a memorandum. Shuler filed his response on

October 5, 2005. Respondents filed a reply to the response filed by petitioner on October 12,

2005.

---

[1]Shuler is represented in this court by Gerald Alan Kelly and Francis J. Cornely. See
Order of the Honorable Margaret B. Seymour filed July 1, 2005.

[2]The state court record contains Shuler's petition for writ of certiorari filed in the South
Carolina Supreme Court following denial of his application for post-conviction relief ("PCR"),
the State's return to the petition for writ of certiorari, Shuler's reply to the return, and the
appendix filed in connection with the petition for writ of certiorari. The appendix is fourteen (14)
volumes. It is cited herein as "App. ___." By agreement of the parties, the state court record was
forwarded to the undersigned prior to the filing of the motion for summary judgment. **The Clerk
of Court shall file the state court record**.

**Procedural History**

The crimes for which Shuler was prosecuted were committed on December 3, 1997 in Dorchester County. Shuler was arrested on December 8, 1997. (App. 1487). Indictments were returned for murder, armed robbery, and kidnapping on January 22, 1998. (App. 5018-5023). Jury selection began on November 2, 1998. (App. 516). Shuler was convicted of all charges and sentenced to death on November 12, 1998. (App. 2400).

Shuler filed a direct appeal upon representation of the South Carolina Office of Appellate Defense raising the following issues (App. 2525-2575):

I.      Whether the trial judge erred by failing to grant Batson relief where he ruled the state's strike of venirewoman DeBerry because she allegedly did not answer "adequately, timely and quickly enough" was "a subterfuge" and "not race neutral," because the solicitor's other reason the judge accepted as legitimate was immaterial under Payton v. Kearse once the judge found a discriminatory reason for striking the potential juror?

II.     Whether the judge erred by continuing the Jackson v. Denno hearing in appellant's absence when he ordered EMS to transport appellant to the hospital because appellant's blood pressure was elevated, since the hearing was a critical stage, the judge did not find appellant voluntarily absented himself at that time, the defense was unable to argue its position on evidentiary issues in appellant's absence, and the judge's belated finding later in the trial that appellant was voluntarily absent was erroneous?

III.    Whether the judge erred by allowing the solicitor to question state's witness Demond Jones about his duty to tell the truth, since this constituted impermissible bolstering of Jones' testimony by the state?

The conviction and sentences were affirmed by published opinion of the South Carolina Supreme Court, State v. Shuler, 344 S.C. 604, 545 S.E.2d 805 (2001). Certiorari was denied by

the United States Supreme Court on October 15, 2001.[3]  Shuler filed his PCR in the Court of Common Pleas for Dorchester County on October 29, 2001. (App. 2707-2712).   After appointment of counsel, three amended applications were filed (App. 2714-2734; 2772-2797; and 2807-2834).  An evidentiary hearing was held before the Honorable Daniel F. Pieper from April 21 through 25, 2003. (App. 2847-3981).  An order dismissing the PCR application was filed on November 13, 2003. (App. 6431-6562).  Shuler's motion to alter or amend the judgment was denied in relevant respects by order filed December 23, 2003. (App. 6600-6621).

Counsel filed a petition for writ of certiorari in the South Carolina Supreme Court raising the following issues:

> I.    Was Shuler denied Due Process of law in violation of the Sixth, Eighth, and Fourteenth Amendments in that the State knowingly presented false evidence during trial?

> II.    Was Shuler denied Due Process of law in violation of the Sixth and Fourteenth Amendments and Rule 5, South Carolina Rule of Criminal Procedure, in that the State failed to disclose exculpatory and mitigating information?

> III.    Was Shuler denied the effective assistance of counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, as a result of counsel's failure to adequately investigate and present mitigating evidence?

The South Carolina Supreme Court denied the petition for writ of certiorari on May 20, 2005. The remittitur was returned on June 8, 2005.

---

[3]The Petition for Writ of Certiorari to the United States Supreme Court sought review of issue II above relating to Shuler's absence from the <u>Jackson v. Denno</u> hearing.

**Grounds for Relief**

In his present petition, Shuler asserts that he is entitled to a writ of habeas corpus on the

following grounds:

A.    The trial court improperly applied <u>Batson v. Kentucky</u>, 476 U.S. 79
(1986), with respect to the state's striking of prospective juror
Dewberry after finding one of the proffered grounds was not race
neutral.

B.    The trial court violated <u>Jackson v. Denno</u>, 378 U.S. 368 (1964), in
conducting a suppression hearing outside petitioner's presence after
ordering emergency medical personnel to remove petitioner from
the courtroom.

C.    The trial court erred by allowing the solicitor to question state's
witness Demond Jones about being instructed by state actors to tell
the truth.   This constituted impermissible bolstering of Jones'
testimony.  Jones was the sole state's witness to claim Petitioner
knew the decedent would be in the back of the armored car when
the robbery occurred, and his testimony was highly prejudicial.

D.    Petitioner was denied his right to represent himself and the trial
court failed to make an appropriate inquiry when the petitioner
attempted to assert this right before trial, and in sentencing in
violation of <u>Faretta v. California</u>, 422 U.S. 806 (1975), the Sixth,
Eighth, and Fourteenth Amendments to the United States
Constitution.

E.    Trial counsel rendered ineffective assistance of counsel at trial under
<u>Strickland v. Washington</u>, 466 U.S. 688 (1984), in violation of the
petitioner's Sixth, Eighth, and Fourteenth Amendment rights and
rights when they adduced harmful evidence at trial which suggested
the petitioner was aware there would be three individuals in the
armored car.

F.    Trial counsel rendered ineffective assistance of counsel at trial under
<u>Strickland v. Washington</u>, 466 U.S. 688 (1984), in violation of the
Petitioner's Sixth, Eighth, and Fourteenth Amendment Rights and
rights under South Carolina law when they adduced harmful victim
impact evidence about the effects of this offense on a surviving
guard at the guilt innocence phase of Petitioner's trial.

4

G.      Trial counsel rendered ineffective assistance of counsel at trial under Strickland v. Washington, 466 U.S. 688 (1984), in violation of the Petitioner's Sixth, Eighth, and Fourteenth Amendment rights and rights under South Carolina law when during their cross-examination of the Petitioner's wife, trial counsel prematurely introduced mitigating evidence regarding the Petitioner's mental state at the time of the offense and harmful evidence suggesting the Petitioner's motive for the robbery of the armored car was greed.

H.      Trial counsel rendered ineffective assistance at trial and sentencing under Strickland v. Washington, 466 U.S. 668 (1984), in violation of the Petitioner's Sixth, Eighth, and Fourteenth Amendment Rights and rights under South Carolina law when during the cross examination of James Gardner trial counsel fostered the impression the victim had not died at the bank but had survived and engaged in a second gun battle with the Petitioner.

I.      Trial counsel rendered ineffective assistance of counsel at trial and in sentencing under Strickland v. Washington, 466 U.S. 668 (1984), in violation of Petitioner's Sixth, Eighth and Fourteenth Amendment when during the cross-examination of Samuel Richardson and Alvin Coker, trial counsel had these witnesses read affidavits asserting the victim was not only alive at the time the Petitioner drove the armored car away from the bank, but that there was a subsequent exchange of gunfire between the victim, using his service revolver, and the Petitioner, using an assault weapon.

J.      The trial Court denied Petitioner his Fifth, Eighth, and Fourteenth Amendment rights when it refused to charge the jury that the victim was not permitted to use deadly force as provided by South Carolina law, where the denial of that instruction operated to deny the Petitioner the effect of a lesser included offense of voluntary manslaughter in violation of Beck v. Alabama 447 U.S. 625 (1980); Hopper v. Evans, 456 U.S. 605 (1982); Hopkins v. Reeves, 524 U.S. 88 (1998), and appellate counsel unreasonably failed to present this claim on direct appeal.

K.      Trial counsel rendered ineffective assistance of counsel at trial under Strickland v. Washington, 466 U.S. 668 (1984), in violation of Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment Rights and rights under South Carolina law when they failed to introduce

5

sufficient evidence which would have generated the defense's requested instruction No. 12.

L.    The trial court impermissibly shifted to the defense the State's burden to establish each and every element of the offense of voluntary manslaughter beyond a reasonable doubt by requiring the defense to show "sufficient legal provocation" by the Petitioner in violation of <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975), and the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and appellate counsel violated, <u>Evitts v. Lucey</u>, 470 U.S. 1065 (1985) when appellate counsel failed to present this ground on direct appeal.

M.    Appellate counsel was ineffective under <u>Evitts v. Lucey</u>, 470 U.S. 1065 (1985) and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment Rights, when appellate counsel failed to alert the state supreme court that the trial court's failure to instruct the jury on the victim's use of deadly force violated the federal due process clause.

N.    Appellate counsel was ineffective under <u>Evitts v. Lucey</u>, 470 U.S. 1065 (1985) and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and violated Petitioner's Fifth, Sixth, Eighth and Fourteenth Amendment Rights when appellate counsel failed to alert the state supreme court on direct appeal that the Solicitor's bolstering of Demond Jones constituted prosecutorial misconduct violating Petitioner's right to a fundamentally fair trial under the federal due process clause.

O.    Trial counsel rendered ineffective assistance of counsel at trial under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and <u>Kimmelman v. Morrison</u>, 477 U.S. 365 (1986), for failing to investigate and prepare, and waiting until immediately before the Petitioner's sentencing phase to file a motion to suppress evidence in violation of the Petitioner's Sixth, Eighth and Fourteenth Amendment Rights under the United States Constitution.

P.    The Solicitor violated Petitioner's due process rights to a fundamentally fair sentencing proceeding when the Solicitor in closing argument compared the homicide of the victim to the act of shooting a dog in a cage, by arguing facts not in evidence, including life without the possibility of parole is "a blank check to do whatever they want to do;" by arguing in 40 years the Petitioner

6

would commit more than a hundred institutional or criminal offenses and; by suggesting his experience as Solicitor permitted him to render an opinion on "how bad this murder was." Likewise, the Solicitor injected impermissible considerations by suggesting the jury should hit a home run like Hank Aaron by sentencing the Petitioner to death and by requesting the jury to send a message to their fellow citizens of Dorchester County that murder will not take place in their county without payment of the ultimate penalty, in violation of Petitioner's Fifth Eighth and Fourteenth Amendment rights to the United States Constitution.

Q.      Appellate counsel was ineffective under <u>Evitts v. Lucey</u>, 470 U.S. 1065 (1985) and <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), and violated Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights when appellate counsel failed to present to the state supreme court the Solicitor's closing argument at sentencing denied Petitioner a fundamentally fair sentencing proceeding under the federal due process clause.

R.      Trial counsel rendered ineffective assistance of counsel at sentencing under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) when it failed to adequately investigate and prepare mitigation witnesses called at sentencing in violation of Petitioner's Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution.

S.      Counsel rendered ineffective assistance of counsel at sentencing under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) when they failed to object and request a mistrial after the Solicitor's closing argument in sentencing suggested that the Petitioner failed to show remorse for the killing of Mr. Brooks notwithstanding state law which prohibited such argument.

T.      Counsel was ineffective for failing to investigate and present available evidence in mitigation the Petitioner was abusing anabolic androgenic steroids (AAS) and to generate expert mental health testimony regarding AAS abuse in support of a life sentence in violation of the Sixth, Eighth, and Fourteenth Amendments, <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

U.      Counsel failed to investigate and present at sentencing available evidence that immediately prior to the offense the Petitioner had consumed "crack" cocaine and had developed other substance abuse disorders which reasonable attorney performance required to be

7

presented in violation of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and the Sixth, Eighth, and Fourteenth Amendments.

V.     Counsel failed to provide to his mental health expert and present at sentencing available evidence that immediately prior to the offense the Petitioner had attempted suicide notwithstanding the defense's presentation during sentencing Petitioner immediately prior to the offense was severely depressed. Reasonable attorney performance required this significant evidence of mental illness to be developed and presented at sentencing in violation of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

W.     The prosecution violated the Fifth, Eighth, and Fourteenth Amendments, <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995), when they failed to correct testimony presented to Petitioner's jury which they knew or should have known was not factual.

X.     The prosecution violated the Fifth, Eighth, and Fourteenth Amendments, <u>Giglio v. United States</u>, 405 U.S. 150 (1972); <u>Brady v. Maryland</u>, 373 U.S. 83 (1963); <u>Kyles v. Whitley</u>, 514 U.S. 419, 437 (1995) and South Carolina law when they failed to correct testimony presented to Petitioner's jury which they knew or should have known was not factual and thereafter engaged in an argument which they knew or should have known was not factual.

Y.     Trial counsel and appellate counsel were constitutionally ineffective under <u>Strickland v. Washington</u>, 488 U.S. [668](1984) and Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendment were violated, when counsel failed to contest the doubling of aggravating factors of kidnapping and robbery in the penalty proceeding.

## Discussion

The South Carolina Supreme Court summarized the evidence presented at trial:

On December 3, 1997, three Anderson Armored Car guards, Alton Amick ("Amick"), Sherman Crozier ("Crozier"), and Brooks, were collecting and delivering money to various banks in the Low County area. Amick was the

8

driver, Crozier sat in the front passenger seat, and Brooks sat in the back of the car.

The Anderson Armored Car is a bullet resistant van with a number of security features. A metal wall topped by a steel mesh screen separated Brooks in the back from Amick and Crozier in the cab. The driver and passenger side doors had "double locks" that take two hands to open. The car's side double doors on the passenger side and double doors in the rear were kept locked. Both Amick and Brooks had keys to access the back of the car, but Brooks did not need the key to get out. Brooks also had access to "kill switches" in the rear--one switch would totally disable the car's engine and the other switch would sound a visual and audible alarm.

At 10:45 a.m., the three guards arrived at First National Bank of Harleyville. Amick looked around twice to see if the area was clear. He opened the door and turned his head to grab his clipboard. When he turned around a man wearing army fatigues, a camouflage face mask, and gloves was pointing a semi-automatic pistol in his face. The attacker also had an assault rifle slung over his shoulder. The attacker shouted three times, "Get out of the God d*mn truck." Amick got out of the car. The attacker then climbed in the driver's seat, pointed the gun at Crozier's head, and ordered him out of the car. Crozier exited the car, but left his door open.

Inside the van, the attacker and Brooks engaged in a gun battle through the screen mesh separating the cab and the rear area. Amick stood near the doorway on the driver's side, Crozier ran around the back of the car. After the gunfire stopped, the attacker threw his semi-automatic handgun out of the car's window. The attacker hesitated for a moment as he tried to get the car into gear, and then drove off at a high rate of speed. As the van sped away, Amick fired four shots at the car's tires with his .38 revolver.

Several eye witnesses saw the attacker drive the car down Shortcut Road at a high rate of speed. Deputy Thomas Limehouse initially responded to the call from First National Bank, but was told to go to the dirt road in his four wheel drive police vehicle. Once there, he met other policemen, and they proceeded on the dirt road. After about a half mile, they saw the armored car on the road. They approached and saw Brooks laying in the back of the van. EMS responded to the scene, but Brooks was dead due to his numerous gunshot wounds. The rear compartment of the car contained $1,555,400 in currency, although much of it was shredded by gunfire and soaked in Brooks' blood.

Members of the Charleston County Sheriff's canine team responded to the dirt road location to track the attacker. One of the officers found a SKS assault rife, which fires 7.62 mm ammunition, submerged under water in a canal. The SKS's 30 round clip was found on the bank of the canal. The canine team followed the scent from the canal into the surrounding woods. The officers found a bloody ski mask hanging on a tree branch. After another 75 yards, the officers found a box of 7.62 mm ammunition on the ground. The dogs also found a folded green duffel bag before they lost the attacker's scent.

The armored car guards recovered the pink-handled, Lorcin .25 semi-automatic handgun the attacker threw out of the window at the bank. The police traced the gun and found it was registered to Shuler's mother, who is deceased. The police contacted Shuler, and he agreed to meet police at his residence that afternoon. Shuler claimed he gave the gun to his mother for protection. According to Shuler, he had not seen the gun since he gave it to his mother prior to her death.

The SKS rifle was traced to Demond Jones ("Jones"), Shuler's cousin's fiance. Since Jones was a convicted felon, it was illegal for him to purchase a SKS, and he was arrested on federal firearm charges. Jones testified he agreed to buy the SKS from Woody's Pawn Shop for Shuler in order to satisfy a debt he owed Shuler for a Cadillac. A week after the purchase, Shuler asked Jones to stand guard while he robbed an armored car in Harleyville. Shuler offered Jones a .44 pistol and $5,000 to help in the robbery.  Jones refused.

After further information implicating Shuler was discovered, FBI agents interviewed Shuler concerning the crime. The agent noticed Shuler nervously pulled on his knit hat during the interview. When Shuler's hat was removed, the agent noticed lacerations to the back of his head. A FBI agent then conducted a polygraph examination.[4]  Shuler confessed to the murder.

Shuler was a former employee of Anderson Armored Car and had briefly worked with Amick and Brooks. According to Shuler, he knew the guards would be armed, and his .25 pistol would be insufficient firepower, so he gave Jones money to buy the SKS. Shuler's confession revealed he concocted a plan to rob the armored car two weeks prior to the crime. His plan involved hiding underneath a house adjacent to the First National Bank

---

[4]The polygraph test was not mentioned to the jury.

until the armored car made its routine stop. Prior to the murder, Shuler waited patiently underneath the house all night until the armored car arrived the following morning.

Following Shuler's confession, police procured a search warrant for his home. Inside Shuler's home, police found ammunition, Shuler's Anderson Armored Car badge, a pistol pouch, and a .44 magnum pistol in the attic. Inside Shuler's pickup truck they found a pair of camouflage hunting gloves, as well as three other camouflage knit hunting gloves.

The physical evidence overwhelmingly demonstrated Shuler was the attacker. The DNA experts testified at trial Shuler matched the blood taken from the top of the driver's seat and the passenger's sun visor. Shuler also matched blood taken from the outside passenger door handle, the double door on the passenger side of the armored car, the top of the cooler between the seats, the SKS clip found on the bank of a ditch, and the ski mask.

According to the pathologist who conducted Brooks' autopsy, there were three major pre-mortem injuries that could have been fatal. There were also a number of wounds the pathologist theorized were post-mortem. The pathologist opined many of the wounds were consistent with injury from a high-powered rifle, and stated all of the shooting happened quickly.

The ballistics expert matched a bullet fragment removed from the right front of Brooks' neck with the SKS rifle. The SKS also matched three fragments from Brooks' right thigh and buttock, and one fragment from his right lateral torso.

Furthermore, a X-ray of Shuler's head wounds indicated the wounds were consistent with gunshot wounds. The ER doctor who performed the X-rays testified the X-rays reflected gunshot fragments in Shuler's head, and Shuler had shoulder bruising consistent with the recoil from a high-powered rifle.

State v. Shuler, 545 S.E.2d at 808-810.

## A.    Procedural Bar

A number of the claims presented in the petition for writ of habeas corpus have not been presented to the state courts or, if they were presented, were abandoned at some point in the

11

appeals process. Because these claims have never been reviewed by the highest court in South Carolina, they are now barred and cannot be considered by this court.

Exhaustion and procedural bypass are separate theories which operate in a similar manner to require a habeas petitioner to first submit his claims for relief to the state courts. The two theories rely on the same rationale. The general rule is that a petitioner must present his claim to the highest state court with authority to decide the issue before the federal court will consider the claim.

### 1.    Exhaustion

The theory of exhaustion is based on the statute giving the federal court jurisdiction of habeas petitions. Applications for writs of habeas corpus are governed by 28 U.S.C. § 2254, which allows relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States." The statute states in part:

> (b)(1)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court, shall not be granted unless it appears that
>
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>>
>> (B)(i)  there is either an absence of available State corrective process; or
>>
>> (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
>
> (2)  An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

> (3)    A State shall not be deemed to have waived the exhaustion
> requirement or be estopped from reliance upon the requirement
> unless the State, through counsel, expressly waives the requirement.
>
> (c)    An applicant shall not be deemed to have exhausted the remedies
> available in the courts of the State, within the meaning of this
> section, if he has the right under the law of the State to raise, by any
> available procedure, the question presented.

This statute clearly requires that an applicant pursue any and all opportunities in the state courts before seeking relief in the federal court. When subsections (b) and (c) are read in conjunction, it is clear that § 2254 requires a petitioner to present any claim he has to the state courts before he can proceed on the claim in this court. See O'Sullivan v. Boerckel, 526 U.S. 838 (1999).

The United States Supreme Court has consistently enforced the exhaustion requirement.

> The exhaustion doctrine existed long before its codification by Congress in
> 1948. In Ex parte Royall, 117 U.S. 241, 251 (1886), this Court wrote that
> as a matter of comity, federal courts should not consider a claim in a habeas
> corpus petition until after the state courts have had an opportunity to act….

Rose v. Lundy, 455 U.S. 509, 515 (1982).

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction. The first avenue is through a direct appeal and, pursuant to state law, he is required to state all his grounds in that appeal. See SCAR 207 and Blakeley v. Rabon, 266 S.C. 68, 221 S.E.2d 767 (1976). The second avenue of relief is by filing an application for post-conviction relief (PCR). See S.C. Code Ann. § 17-27-10 et seq. A PCR applicant is also required to state all of his grounds for relief in his application. See, S. C. Code Ann. § 17-27-90. Strict time deadlines govern direct appeal and the filing of a PCR in the South Carolina Courts. A PCR must

13

be filed within one year of judgment, or if there is an appeal, within one year of the appellate court decision. S.C. Code Ann. § 17-27-45.

When the petition for habeas relief is filed in the federal court, a petitioner may present only those issues which were presented to the South Carolina Supreme Court through direct appeal or through an appeal from the denial of the PCR application, whether or not the Supreme Court actually reached the merits of the claim.[5] If any avenue of state relief is still available, the petitioner must proceed through the state courts before requesting a writ of habeas corpus in the federal courts, Patterson v. Leeke, 556 F.2d 1168 (4th Cir. 1977) and Richardson v. Turner, 716 F.2d 1059 (4th Cir. 1983). If petitioner has failed to raise the issue before the state courts, but still has any means to do so, he will be required to return to the state courts to exhaust the claims. See Rose v. Lundy, supra.

2.     **Procedural Bypass**[6]

Procedural bypass is the doctrine applied when the person seeking relief failed to raise the claim at the appropriate time in state court and has no further means of bringing that issue before the state courts. If this occurs, the person is procedurally barred from raising the issue in his federal habeas petition. The United States Supreme Court has clearly stated that the procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by

---

[5]In cases where the South Carolina Supreme Court applied a procedural bar, however, this court is directed to also apply that bar, except in certain limited circumstances. See discussion below on procedural bypass.

[6]This concept is sometimes referred to as procedural bar or procedural default. If a petitioner procedurally bypasses his state remedies, he is procedurally barred from raising them in this court.

the federal courts, <u>Smith v. Murray</u>, 477 U.S. 527, 533 (1986). Bypass can occur at any level of the state proceedings, if a state has procedural rules which bar its courts from considering claims not raised in a timely fashion. The two routes of appeal in South Carolina are described above, and the South Carolina Supreme Court will refuse to consider claims raised in a second appeal which could have been raised at an earlier time. Further, if a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court.

If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. State procedural rules promote

> not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

<u>Reed v. Ross</u>, 468 U.S. 1, 10-11 (1984).

Although the federal courts have the power to consider claims despite a state procedural bar,

> the exercise of that power ordinarily is inappropriate unless the defendant succeeds in showing both 'cause' for noncompliance with the state rule and 'actual prejudice resulting from the alleged constitutional violation.'

<u>Smith v. Murray</u>, <u>supra</u>, quoting <u>Wainwright v. Sykes</u>, 433 U.S. at 84 (1977); <u>see</u> <u>also</u> <u>Engle v. Isaac</u>, 456 U.S. 107, 135 (1982).

Stated simply, if a federal habeas petitioner can show (1) cause for his failure to raise the claim in the state courts, and (2) actual prejudice resulting from the failure, a procedural bar can be ignored and the federal court may consider the claim. Where a petitioner has failed to comply

15

with state procedural requirements and cannot make the required showing(s) of cause and prejudice, the federal courts generally decline to hear the claim. See Murray v. Carrier, 477 U.S. 478, 496 (1986).

### 3.    Inter-relation of Exhaustion and Procedural Bypass

As a practical matter, if a petitioner in this court has failed to raise a claim in state court, and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts, and this court is barred from considering the claim (absent a showing of "cause" and "actual prejudice"). In such an instance, the exhaustion requirement is "technically met" and the rules of procedural bar apply. Matthews v. Evatt, 105 F.3d 907 (4th Cir. 1997); cert. denied, 522 U.S. 833 (1997) citing Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991); Teague v. Lane, 489 U.S. 288, 297-98 (1989); and George v. Angelone, 100 F.3d 353, 363 (4th Cir. 1996).

### 4.    Excusing Default

The requirement of exhaustion is not jurisdictional, and this court may consider claims which have not been presented to the South Carolina Supreme Court in limited circumstances. Granberry v. Greer, 481 U.S. 129, 131 (1989). First, a petitioner may obtain review of a procedurally barred claim by establishing cause for the default and actual prejudice from the failure to review the claim. Coleman v. Thompson, 501 U.S. at 750 and Gary v. Netherland, 518 U.S. 152, 162 (1996). Second, a petitioner may rely on the doctrine of actual innocence.

A petitioner must show both cause and actual prejudice to obtain relief from a defaulted claim. In this context, "cause" is defined as "some objective factor external to the defense [that]

16

impeded counsel's efforts to comply with the State's procedural rule." Strickler v. Greene, 527 U.S. 263, 283 n. 24 (1999) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986). A petitioner may establish cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor which hindered compliance with the state procedural rule, demonstrate the novelty of his claim, or show interference by state officials. Murray v. Carrier; Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499 U.S. 913 (1991); and Clanton v. Muncy, 845 F.2d 1238 (4th Cir.), cert. denied, 485 U.S. 1000 (1988). A petitioner must show reasonable diligence in pursuing his claim to establish cause. Hoke v. Netherland, 92 F.3d 1350, 1354 n. 1 (4th Cir. 1996). Further, the claim of cause must itself be exhausted. Edwards v. Carpenter, 529 U.S. 446 (2000) (failure of counsel to present issue on direct appeal must be exhausted in collateral proceeding as ineffective assistance to establish cause for default).

Generally, a petitioner must show some error to establish prejudice. Tucker v. Catoe, 221 F.3d 600, 615 (4th Cir.), cert. denied, 531 U.S. 1054 (2000). Additionally, a petitioner must show an actual and substantial disadvantage as a result of the error, not merely a possibility of harm to show prejudice. Satcher v. Pruett, 126 F.3d 561, 572 (4th Cir. 1997).

"Actual innocence" is not an independent claim, but only a method of excusing default. O'Dell v. Netherland, 95 F.3d 1214, 1246 (4th Cir. 1996), aff'd, 521 U.S. 151 (1997). To prevail under this theory, a petitioner must produce new evidence not available at trial to establish his factual innocence. Royal v. Taylor, 188 F.3d 239 (4th Cir. 1999). A petitioner may establish actual innocence as to his guilt, Id., or his sentence. Matthews v. Evatt, 105 F.3d at 916.

17

### 5.     Procedure

Procedural default is an affirmative defense which is waived if not raised by respondents.  Gray v. Netherland, 518 U.S. at 165-66.  It is petitioner's burden to show cause and prejudice or actual innocence.  If not shown by petitioner, the court need not consider the defaulted claim.  Kornahrens v. Evatt, 66 F.3d 1350 (4th Cir. 1995), cert. denied, 517 U.S. 1171 (1996).

In the present case, Shuler has presented only seven claims to the South Carolina Supreme Court for review–four in his direct appeal (App. 2526-27 and Petition, pp. 2-3) and three in his petition for writ of certiorari following denial of his PCR (See Petition for Writ of Certiorari, p. 1 and Petition, p. 8).  These claims are stated above and correspond to Grounds A, B, J, T, U, V, and W in the present petition.  Respondents concede that these grounds, with the exception of Ground J, are not procedurally barred and are properly before this court.  With respect to Ground J and all other grounds in the present petition, respondents assert procedural bar.  Shuler does not address respondents' arguments nor does he attempt to argue or show cause and prejudice or actual innocence.  Thus, the undersigned concludes that all grounds in the present petition except Grounds A, B, T, U, V, and W are procedurally barred.

In Ground J, Shuler asserts that his Fifth, Eighth, and Fourteenth Amendment rights were violated when the trial court "refused to charge the jury that the victim was not permitted to use deadly force as provided by South Carolina law, where the denial of that instruction operated to deny the petitioner the effect of a lesser included offense of voluntary manslaughter in violation of Beck v. Alabama, 447 U.S. 625 (1980); Hopper v. Evans, 456 U.S. 605 (1982); Hopkins v.

18

Reeves, 524 U.S. 88 (1988), and appellate counsel unreasonably failed to present this claim on direct appeal."

Ground J raises two issues.  First, were Shuler's rights violated when the trial court refused to give a jury instruction requested by counsel,[7] and second, was counsel ineffective for failing to raise the constitutional claim on direct appeal.  The ineffective assistance of appellate counsel argument necessarily recognizes that the constitutional claim based on failure to charge was not presented to the South Carolina Supreme Court on direct appeal.  The failure to give the requested instruction was presented as issue number four on direct appeal purely as a matter of state law and ruled on by the South Carolina Supreme Court on that basis only.  State v. Shuler, 545 S.E.2d at 819-21.  Thus, the claim as asserted in the present petition has never been presented to the South Carolina Supreme Court.  For this reason, respondents assert that as a freestanding constitutional claim, Ground J, is procedurally barred.  Shuler has not responded to this argument.    T    o properly exhaust a claim, a petitioner must fairly present it to the state courts for review.  O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).  This requires presenting the same claim to all appropriate courts.  A claim that alleges violation of state law or procedure does not exhaust

---

[7]Trial counsel requested the following charge:
Upon view of a felony committed or upon view of a larceny committed, any person may arrest a felon or thief and take him to a judge or magistrate to be dealt with according to law.  Such arrest, however, must be made with the use of reasonable force.

In making an arrest, it is unlawful to use deadly force in an attempt to thwart the commission of the felony or theft or to apprehend the felon.

The trial court refused to give this charge and instead gave a different instruction on voluntary manslaughter.  Voluntary manslaughter was submitted to the jury as a possible verdict.

federal constitutional claims based on the same facts.  <u>Baker v. Corcoran</u>, 220 F.3d 276, 289 (4th Cir. 2000), <u>cert</u>. <u>denied</u>, 531 U.S. 1193 (2001) (challenge to jury instruction on direct appeal based solely on state law does not exhaust Due Process Clause claim for habeas review).

Insofar as Shuler asserts that his counsel on direct appeal was ineffective for failing to press this issue, that claim is also procedurally barred.  The claim was asserted in Shuler's PCR (Petition, p. 5; App. 6435) and rejected by the PCR court (App. 6521-26).  However, Shuler did not present this issue to the South Carolina Supreme Court following denial of his PCR.  Thus, his claim of ineffective assistance of appellate counsel is also procedurally barred.  <u>Edwards v. Carpenter</u>, <u>supra</u>.

**B.    Merits**

Since Shuler filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended.  <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997); <u>Breard v. Pruett</u>, 134 F.3d 615 (4th Cir.), <em>cert. denied,</em> 521 U.S. 371 (1998) and <u>Green v. French</u>, 143 F.3d 865 (4th Cir. 1998), <em>cert. denied</em>, 525 U.S. 1090 (1999).  That statute now reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court has addressed procedure under § 2254(d).  See <u>Williams v. Taylor</u>, 529 U.S. 362 (2000).  In considering a state court's interpretation of federal law, this

20

court must separately analyze the "contrary to" and "unreasonable application" phrases of § 2254(d)(1).

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases …. A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [the Court's] precedent.
>
> * * *
>
> [A] state-court decision involves an unreasonable application of [the Supreme] Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of [the] Court's precedent if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

Id. at 1519-20.  Ultimately, a federal habeas court must determine whether "the state court's application of clearly established federal law was objectively unreasonable." Id. at 1521.

    1.    Batson Challenge (Ground A)

        Shuler asserts that his "rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution" were violated when the State used a peremptory challenge to excuse an African-American during jury selection. (Petition, p. 9).  This issue was raised on direct appeal and ruled on by the South Carolina Supreme Court.  Thus, it has been fully exhausted and is properly before this Court for habeas review.[8]  Respondents argue that the South

---

        [8]The South Carolina Supreme Court addressed the issue only on Fourteenth Amendment Equal Protection Clause grounds.  State v. Shuler, 545 S.E.2d 810.

Carolina Supreme Court's rejection of this claim was not an unreasonable application of the <u>Batson</u> decision (Mot. for Summary Judgment, p. 26).  Petitioner makes no argument in support of this claim.

The Honorable A. Victor Rawl presided at trial.  After general <u>voir</u> <u>dire</u> of the potential jurors, seven panels of twelve jurors were randomly selected.  Each panel was given a time to report for individual voir dire.  At the beginning of individual voir dire, the court determined a "Type" for each potential juror: "a Type I juror would always give the death penalty, a Type II juror would always give life imprisonment, and a Type III juror would consider giving the death penalty after considering all the evidence." <u>State v. Shuler</u>, 545 S.E.2d at 811.  Then, the State and defense were given the opportunity to question the potential juror.  After this process, the Court found the potential juror to be qualified or unqualified.  The Court qualified forty potential jurors. (App. 581).  A list of those forty jurors was prepared in the order in which they were qualified. (App. 582; 610-11).  The defense was allotted ten peremptory challenges and the State five.[9]  The defense used all ten peremptory challenges for Caucasian jurors.  The State used only two of its five peremptory challenges, the second for Bettie Dewberry, an African-American female.

---

[9]Two alternates were selected.  The defense was given two peremptory challenges and the State one as to each. (App. 609).

After the jury had been selected in this manner, defense counsel raised a challenge pursuant to <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986) as to both jurors excused by the State.[10]  Eventually, the trial court upheld the peremptory challenge exercised by the State.

Dewberry was on the fourth panel of twelve potential jurors for individual voir dire. Thirty-six jurors were subject to individual voir dire prior to Dewberry.  Twenty-seven jurors were subject to individual voir dire after Dewberry.  Apparently this process took three days, November 2-4, 1998.

The trial court began Dewberry's individual voir dire, as it had with other potential jurors, by inquiring if she was a Type I, II, or III juror.  The following colloquy took place:

> Q.  And at looking at that, which of three types, Mrs. Dewberry, do you feel you qualify as?
> A.  Sir?
> Q.  It's not a question and answer.  It just says the three types of jurors. One would always vote for the death penalty if given the opportunity.  One person can never ever under the circumstances give the death penalty.  And one person would be interested in listening to all the evidence and testimony to form their opinion; and that opinion could be based on the evidence and circumstances of the facts to vote for the death penalty or life depending upon their understanding and feelings on the evidence?
> A.  I.
> Q.  Could you ever vote for the death penalty?
> A.  Yes, sir.
> Q.  All right.
>     She's indicated possible two or three.  That's my understanding of your answer.  You feel that you might be able to give due consideration and might be able to vote either way; is that right?

---

[10]The first of the jurors was Bobby Sarine.  The record is unclear as to his race, but the South Carolina Supreme Court concluded he was an Indian.  <u>State v. Shuler</u>, 545 S.E.2d at 811. The State's use of a peremptory challenge to excuse Sarine is not an issue raised in the present petition.

A.     Yes Sir.

Q.     But you would lean towards life without parole, correct?

A.     Yes sir.

(App. 569-70).

After counsel examined Dewberry, the Court found her to be qualified. (App. 575). The Solicitor at that point put the following on the record:

> **SOL BAILEY:** In regard to the last juror, again, I agree with the Court's assessment that she is qualified under <u>Wain Wright vs Witt</u> status. I could not hear her initial response to your questions, but you did repeat it. And I just want to check with the court reporter to see if she got all of that down.
>
> And I just wanted to record to reflect that there was – I didn't time it, but a very, very long hesitation where Mrs. Dewberry just stared at me and didn't give the answer for a full minute. She did show–I thought–an undue amount of hesitation on those questions.

(App. 577).

Apparently the following day, the jury was selected, the State exercised a peremptory challenge to excuse Dewberry, and the defense raised the <u>Batson</u> challenge. The Sarine challenge was taken up first and Dewberry second. (App. 619-20). The Court required the Solicitor to state race-neutral reasons for excusing Dewberry. The Solicitor responded with two reasons: (1) Dewberry gave vacillating responses to his questions about the death penalty;[11] and (2) she gave false responses on her juror questionnaire as to whether she had been previously arrested.[12]

---

[11]The Solicitor cited a number of South Carolina cases that such responses constitute a race-neutral reason under <u>Batson</u>.

[12]Dewberry's "rap sheet" indicated that she had been arrested on two occasions. (App. 624).

24

The first reason stated, that Dewberry was vacillating and hesitant, is the focus of this claim. The Solicitor stated:

> Mrs. Dewberry, Your Honor, was the only one of the jurors that ended up on the list that was potentially able to be passed by either side that at any point indicated she was a possible No. 2 juror. She said she was a 2 or 3, I believe.

(App. 622).

Then, the following colloquy occurred:

> **THE COURT:** No, sir, she said she was a three from the beginning.

(Id.)

* * *

> Your Honor, if there is some discrepancy between your recollection and your notes about her responses to being a No. 2 juror, I would ask, if it would assist the Court's decision to ask the Court Reporter to try to find it please. All three of us apparently heard something different then Your Honor heard.
>
> **THE COURT:** Well, I'm basing a No. 3 on what she told me from the stand at the beginning.
>
> When I asked the question, and I was the first one to ask the question: Are you a number – can you tell me what classification by number you think you are. Mrs. Dewberry said three.
>
> **SOL. BAILEY**: Yes, sir.
>
> **THE COURT**: Right off the bat.
>
> Now, what you may think in your notes that you think she qualifies as is one thing, but that I wrote down clearly in every single note before I wrote on the sheet that the juror handed me.

(App. 628).

The Court then ruled:

> I'm finding with regard to whether or not she's responded to the questions adequately, timely and quickly enough is a subterfuge and is not race neutral.

(App. 629)

On direct appeal, Shuler argued that it was error for the trial court not to quash the jury panel once it had determined that one of the reasons offered by the Solicitor was a subterfuge for discrimination.  Shuler's argument was primarily based on Payton v. Kearse, 329 S.C. 51, 495 S.E.2d 205 (1998) where the South Carolina Supreme Court rejected the "dual motivation" doctrine employed in some jurisdictions in favor of the "tainted" approach.  Under Payton, if one race-neutral reason is found to be false, the jury selection process cannot be saved by a second non-discriminatory reason.

On Shuler's direct appeal, the South Carolina Supreme Court reaffirmed its decision in Payton, but held that the trial court's conclusion that Dewberry was not hesitant and vacillating was clearly erroneous.   The Supreme Court found that the trial judge was confused over Dewberry's voir dire responses during the Batson hearing, recognizing that the Batson hearing took place well after her voir dire.[13]  As the above quoted portions of the record show, the trial judge's recollection of Dewberry's "type" was faulty.  The Supreme Court also had the transcript to rely on as well as the audio tape of Dewberry's voir dire.  The record shows that Dewberry did equivocate in her answers and was hesitant.  During questioning, the Solicitor remarked that Dewberry had hesitated and shrugged her shoulders when asked if she could impose the death penalty. (App. 579-82).  After Dewberry's testimony was over, the Solicitor put on the record that she was hesitant in her answers about the death penalty.  After listening to the audio tape, the Supreme Court found that Dewberry's answers to questions concerning the death penalty were

---

[13]As noted above, twenty-seven potential jurors were questioned after Dewberry.

"weak, timid, and almost inaudible."  While her answers to other questions were "answered in a normal audible tone, and she seemed confident."  State v. Shuler, 545 S.E.2d at 812.

Finding the trial court's ruling on this issue to be clearly erroneous, the Supreme Court applied Batson principles to Dewberry's voir dire.  In Batson, the Supreme Court held that a prosecutor's discriminatory use of peremptory challenges violated the Equal Protection Clause of the Constitution.  The Court established a Title VII-like framework to show discriminatory motive. To establish a prima facie case, "the defendant first must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race."  Batson, 476 U.S. at 96 (internal citations omitted).  The Court also found that after making this initial showing, the defendant may rely on the fact that the peremptory challenge process opens the door for discrimination.  Id.  Last, the Court found that "the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used the practice to exclude veniremen from the petit jury on account of their race."  Id.  In determining whether the defendant has established his claim, the court must look to all the relevant circumstances.  Id. at 96-97.  Relevant circumstances include consideration of any pattern in the strikes and the questions asked by the prosecutor during voir dire.  Id.

After determining that the trial court's finding was clearly erroneous, the South Carolina Supreme Court found the reasons offered by the Solicitor to be legitimate, race-neutral reasons for excusing Dewberry.  The Supreme Court also found that the final composition of the jury showed no intent to discriminate.  The jury was composed of two African-Americans, one other minority, and one of the two alternates was African-American.  State v. Shuler, 545 S.E.2d at 813.

The South Carolina Supreme Court found, after a thorough review of the record, that no Batson violation occurred.  Shuler has not shown the decision of the South Carolina Supreme Court was "contrary to" or an "unreasonable" application of Batson.

B.     Jackson v. Denno (Ground B)

Shuler argues that his constitutional rights were violated when the trial court went forward with a pretrial hearing on his motion to suppress statements given to law enforcement officers after he was removed from the courtroom by emergency medical personnel.  This issue was raised on direct appeal.  The South Carolina Supreme Court determined that no violation of Shuler's right to confrontation under the Sixth Amendment or his right to Due Process occurred.  State v. Shuler, 545 S.E.2d at 814.  Thereafter, this issue was presented in Shuler's petition for writ of certiorari to the United States Supreme Court.  Certiorari was denied.

Shuler made several statements to law enforcement prior to his arrest including a full confession to the robbery and murder to FBI Special Agent Espie after a deceptive polygraph examination. (App. 131-33 and 2516-68).   The defense made a motion to suppress Shuler's statements.  A suppression hearing was held by Judge Rawl on October 5, 1998.[14]  During that hearing, the Court ordered that Shuler be removed from the proceeding. (App. 0043-44) and the hearing continued in his absence.  This absence forms the factual basis for Shuler's claim.

---

[14]Jackson v. Denno, 378 U.S. 368, 376-77 (1964) requires the trial court, upon motion of the defendant, to hold a pretrial conference outside the presence of the jury to determine the voluntariness of statements made by defendant prior to their introduction at trial.

A.     Confrontation Clause

The Confrontation Clause contained in the Sixth Amendment requires "(i)n all criminal prosecutors, the accused shall enjoy the right...to be confronted with the witnesses against him." This right applies to state prosecutions through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400 (1965). The ultimate goal of the Confrontation Clause is to ensure the reliability of evidence, but the right is procedural rather than substantive. Crawford v. Washington, 541 U.S. 36 (2004). The right to cross-examination is the essence to the interest protected by the Confrontation Clause. Davis v. Alaska, 415 U.S. 308 (1974).

The South Carolina Supreme Court applied these principles and the holding of Kentucky v. Stincer, 482 U.S. 730 (1987) to Shuler's Confrontation Clause claim. Stincer involved a similar claim based on defendant's exclusion from a competency hearing held prior to the trial testimony of two young children who were victims of sexual assaults. The Stincer court concluded that the appropriate inquiry under the Confrontation Clause was "whether excluding the defendant from the hearing interferes with his opportunity for cross-examination" and held that since the defendant was available during his attorney's "full and complete" cross-examinations of the children at trial, no violation occurred. Id. at 740. ("Any questions asked during the competency hearing, which [defendant's] counsel attended and in which he participated, could have been repeated during direct examination and cross-examination of the witnesses in [defendant's] presence."). The South Carolina Supreme Court applied this rationale to Shuler's suppression hearing: "Any questions asked during the Jackson v. Denno hearing were presented before the jury at trial when Shuler was present. Therefore, Shuler's right to confrontation was not adversely effected." State v. Shuler, 545 S.E.2d at 815.

29

Thus, the South Carolina Supreme Court held that Shuler's <u>Jackson v. Denno</u> hearing was analogous to the competency hearing in <u>Stincer</u>. Shuler's offers no argument that this analogy was flawed. Instead, he generally argues that it would have been helpful for cross-examination during the <u>Jackson v. Denno</u> hearing if he had been present. (Pet. Mem., 15). He does not address the holding that his right to confrontation was not violated since he was present for cross-examination at trial. The undersigned concludes that the South Carolina Supreme Court reasonably applied <u>Stincer</u> to Shuler's case.

        B.      Due Process

        The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." This provision incorporates the Fifth Amendment's Due Process Clause and makes it applicable to the states. "The constitutional right to presence is rooted to a large extent in the Confrontation Clause of the Sixth Amendment, but we have recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." <u>United States v. Gagnon</u>, 470 U.S. 522, 526 (1985). This Due Process right of a defendant is not absolute, but applies "'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the change…[T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" <u>Id</u>. (citing <u>Snyder v. Massachusetts</u>, 291 U.S. 97 (1934). "[A] defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." <u>Kentucky v. Stincer</u>, 482 U.S. at 745.

The South Carolina Supreme Court held that no Due Process Clause violation occurred because: (1) even though a Jackson v. Denno hearing is a critical event with respect to the outcome of the criminal proceeding, Shuler's absence did not diminish the fairness of the proceeding; and (2) Shuler waived his right to be present by engaging in disruptive behavior.   State v. Shuler, 545 S.E.2d at 815-16.

Review of the entire record is necessary to address the reasonableness of the holding of the South Carolina Supreme Court.   The record shows:

1.      A preliminary hearing was held before a state magistrate on June 16, 1998. (Ap. 2436).   The transcript reveals that Shuler was disruptive throughout the hearing and was admonished by his counsel to be silent. (App. 2439).   Shuler insisted that he was on active duty in the Army and stationed at Fort Dix, New Jersey. (App. 2442).   Shuler's counsel stated that Shuler refused to communicate with him. (App. 2447).

2.      The State made a motion for a mental evaluation based on Shuler's behavior at the preliminary hearing and while he was in jail.   A hearing was held on the motion on July 14, 1998 before Judge Rawl.   The Solicitor reported that Shuler appeared to suffer a seizure[15] while he was detained but subsequent medical tests showed no signs that he actually had a seizure. (App. 2478-79).   Shuler's counsel informed the Court that Shuler continued to be uncooperative with his attorneys and insisted that they contact military officials at Ft. Dix and that he had a memory loss. (App.

_____

[15]The seizure and hospitalization occurred on March 19, 1998. (App. 0240).

2480).  Judge Rawl was furnished a copy of the transcript of the preliminary hearing at the competency hearing. (App. 2482).  Judge Rawl ordered that Shuler be sent to the South Carolina State Hospital for evaluation on July 16, 1998. (App. 0233).

3.    The evaluation was completed and Shuler was returned to custody.

4.    The Jackson v. Denno hearing was scheduled on October 5, 1998, at 1:00 p.m. Shuler refused to leave his cell to be transported to the hearing.  Judge Rawl ordered that law enforcement bring Shuler to Court by "use of whatever force is necessary." (App. 0024-25).

5.    Shuler arrived for the hearing at approximately 3:00 p.m., shackled and wearing a mask to keep him from spitting on the law enforcement officers who transported him. (App. 0027).

6.    Just prior to Judge Rawl's entry into the courtroom, Shuler purposely struck his head on the counsel table.  Counsel asked that EMS be summoned to examine Shuler for injury.  The request was granted and the hearing commenced before their arrival. (App. 0026-28).

7.    EMS arrived approximately 15 minutes later and a recess was taken to allow Shuler to be examined. (App. 0041). EMS reported that Shuler's blood pressure was elevated and Judge Rawl ordered that he be removed from the courtroom for treatment.  The record shows that Shuler was disruptive at this point interrupting Judge Rawl by shouting. (App. 0043).

8.   Judge Rawl stated: "Let the record reflect at this point in time, I do not find that [Shuler's] actions are voluntary or involuntary, but there is no critical phase regarding the <u>Jackson v. Denno</u> hearing that is being waived.  <u>Id</u>.

9.   After Shuler was removed, the <u>Jackson v. Denno</u> hearing was resumed.  <u>Id</u>.

10.  During the hearing, Judge Rawl indicated that the hearing would be continued to allow Shuler to present evidence if he wished. (App. 0121).  Judge Rawl added: "I may find depending entirely upon information I receive at a date[16] that he voluntarily expended himself from this hearing.  If I made that decision, of course, he's waived his right to be here." (App. 0121-22).

11.  At the conclusion of the testimony offered by the State, the <u>Jackson v. Denno</u> hearing was continued to allow the defense to present evidence after Shuler's return. (App. 0161).

12.  Based on Shuler's actions at the <u>Jackson v. Denno</u> hearing of October 5, 1998, Judge Rawl ordered further evaluation at the South Carolina State Hospital.[17] Also, the defense began an independent evaluation by Dr. Harold Morgan. (App. 0229 and 0254).

13.  The <u>Jackson v. Denno</u> hearing resumed on October 20, 1998, with Shuler present. (App. 0223).  Judge Rawl explained the purpose of the hearing to Shuler and advised him of his Fifth Amendment right to testify or not.  Shuler initially

---

[16]As of the <u>Jackson v. Denno</u> hearing, the Court had not received the evaluation from the doctors at the State Hospital.

[17]This evaluation took place on October 12, 1998. (App. 0254).

indicated that he wished to testify, but after a conference with his attorneys decided that he would not testify. Judge Rawl declared the Jackson v. Denno hearing complete. (App. 0225-28).

14.    Judge Rawl immediately proceeded to the competency hearing and evaluators from the South Carolina State Hospital were called as witnesses. (App. 0232). Dr. Richard Frierson examined Shuler before and after the October 5, 1998 Jackson v. Denno hearing. He testified that review of the hospital records that showed with respect to the March 19, 1998 seizure indicated a diagnosis of "a conversion reaction versus malingering versus atypical psychosis, and probable nonepileptic seizure versus mixed seizure." (App. 0240). Dr. Frierson also concluded that Shuler was malingering during his evaluations prior to the Jackson v. Denno hearing based on test results and observation and after the hearing. (App. 0241-0301).[18] Dr. Jeffrey Vidic also concluded that Shuler was malingering during testing. (App. 0314).

15.    The competency hearing was continued until October 27, 2005, at which time Dr. Morgan testified. (App, 0384). Dr. Morgan testified that he examined Shuler on September 24, October 18[19] and 23, 1998. (App. 0388). Dr. Morgan's

_____

    [18]During the second evaluation following the October 5 Jackson v. Denno hearing, Shuler refused to answer Dr. Frierson's questions but responded only with military marching cadence. However, when not being questioned or knowingly observed by the doctors, he acted normally and responded appropriately with staff. This was corroborated by a nurse from the State Hospital. (App. 0301-09).

    [19]Shuler "walked out of" the examination on October 18. (App. 0388).

examination was hindered by Shuler's claim of lack of memory. When asked his opinion of the cause of Shuler's lack of memory, Dr. Morgan replied, "I think most of what we're seeing is probably malingering." (App. 395). Dr. Morgan also agreed with Dr. Frierson's report "to the extent that there is a lot of evidence for the malingering issue." (App. 0400).

16.     In arguments after the testimony, Shuler's attorneys stated that "Shuler has been unable to assist us in his defense" (App. 0416) and that "he won't talk to us, won't meet with us, won't do this, won't come out of the cell." (App. 0419).

17.     Judge Rawl concluded that based on the record, Shuler "has decided, for whatever reason, to not assist counsel in his defense. And I find that is a voluntary act on his part. He has voluntarily and intentionally failed and refused to assist counsel in his own defense." (App. 0427).

18.     Judge Rawl further found that Shuler "voluntarily absented himself" from the October 5, 1998 Jackson v. Denno hearing. (App. 0431).

This review of the record fully supports the findings of the South Carolina Supreme Court on Shuler's due process claim stemming from his absence from the October 5, 1998 hearing.

As noted above, the South Carolina Supreme Court held that even though the Jackson v. Denno hearing was a critical phase of the criminal proceeding, "Shuler's presence would not have contributed to the fairness" of the Jackson v. Denno hearing. State v. Shuler, 545 S.E.2d at 815. The Supreme Court gave several reasons for this finding. First, Shuler was non-cooperative and disruptive at the hearing. Second, the only prejudice cited by counsel was their inability to ask Shuler if he signed a written Miranda waiver introduced at the hearing. Last, Shuler did not

testify or offer any evidence once the hearing was resumed on October 20, 1998.  The Supreme

Court concluded that "Shuler has not alleged or demonstrated knowledge of any facts not known

to his attorneys that would have been relevant to the voluntariness determination.  Id.  In his

present memorandum in support of his petition, Shuler does not challenge the facts found by the

Supreme Court or the rationale used to reject the due process claim. (Pet. Mem., 12-17).

The Supreme Court also upheld Judge Rawl's finding that no due process violation

occurred because Shuler waived his right to be present by engaging in disruptive behavior.  Shuler

generally argues that his sole disruptive act of banging his head on the table prior to the hearing

was insufficient to remove him (Pet. Mem., 16).  However, the South Carolina Supreme Court

considered "Shuler's pattern of disruptive conduct on the day of the Jackson v. Denno hearing."

State v. Shuler, 545 S.E.2d at 816.  Shuler makes no argument and cites no authority that

consideration of all events which occurred prior to October 5, 1998 of which Judge Rawl had

knowledge was improper.

    c.    Harmless Error

Alternatively, the South Carolina Supreme Court held that even if Shuler's

rights under the Confrontation Clause or the Due Process Clause were violated, the error was

harmless.  "Denials of a defendant's right to be present, as well as other constitutional violations,

are subject to a harmless error analysis.  State v. Williams, 292 S.C. 231, 355 S.E.2d 861

(1987)." State v. Shuler, 545 S.E.2d at 816.  Respondents, citing Rusken v. Spain, 464 U.S. 114,

117 n. 2 (1983) argue that the Supreme Court's holding of harmless error was correct.  They

argue that: (1) Shuler's presence would not have been helpful because Shuler declined to cooperate

with his attorneys; (2) Shuler has never proffered any fact relating to the voluntariness of his

statements that would have been helpful to his attorneys; and (3) the evidence against Shuler presented at trial was overwhelming.(Res. Mem., 51-52). Shuler has not responded to these arguments or to the Supreme Court's holding. (Pet. Mem. 12-17).

Constitutional violations are subject to a harmless error analysis. Chapman v. California, 386 U.S. 18, 24 (1967) (on direct appeal, court must find error harmless beyond a reasonable doubt). "The final decision whether the alleged constitutional error was harmless is one of federal law." Rusken v. Spain, 464 U.S. at 120. The standard for harmless error on collateral review is whether the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946). See Fullwood v. Lee, 290 F.3d 663, 679 (4th Cir.), cert. denied, 537 U.S. 1120 (2003) for application of Brecht after passage of the AEDPA. To apply this standard, the Court makes a de novo review to determine whether the error "substantially sway[ed] or substantially influence[d] the response" of the jury to the question posed to it, i.e., whether the defendant is guilty or not guilty. Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir.) (en banc), cert. denied, 522 U.S. 824 (1997).

In its harmless error analysis, the South Carolina Supreme Court did not cite any United States Supreme Court cases, but instead cited State v. Williams, 292 S.C. 231, 355 S.E.2d 861 (1987). State v. Shuler, 545 S.E.2d at 816. Williams held that the defendant waived his right to appear under the Confrontation Clause and failed to object to a trial in his absence. State v. Williams, 355 S.E.2d at 862. Thus, the South Carolina Supreme Court did not employ the Brecht standard, but essentially relied on its previous analysis under the Confrontation Clause and Due

Process Clause and the fact that "the evidence in this case overwhelming inculpates Shuler." <u>State v. Shuler</u>, <u>Id.</u>

The undersigned concludes that the State presented an overwhelming case leading to the jury's finding of guilt. See the recitation of evidence summarized by the South Carolina Supreme Court quoted above. Thus, the undersigned concludes that if constitutional error occurred in continuing the <u>Jackson v. Denno</u> hearing in Shuler's absence, the error was harmless under the <u>Brecht</u> standard because Shuler would have been found guilty even if his statements had not been admitted into evidence at trial.

> 3.      Ineffective Assistance of Trial Counsel (Grounds T, U and V) During Penalty Phase

Shuler asserts that his attorneys failed to investigate and present evidence of substance abuse and mental illness during the sentencing phase of his trial. These issues were developed through the PCR process and presented to the South Carolina Supreme Court in the petition for writ of certiorari.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970). In the case of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the United States Supreme Court set forth two factors that must be considered in evaluating claims for ineffective assistance of counsel. A petitioner must first show that his counsel committed error. If an error can be shown, the court must consider whether the commission of an error resulted in prejudice to the defendant.

To meet the first requirement, "[t]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Turner v. Bass, 753 F.2d 342, 348 (4th Cir. 1985) quoting Strickland, *reversed on other grounds*, 476 U.S. 28 (1986). In meeting the second prong of the inquiry, a complaining defendant must show that he was prejudiced before being entitled to reversal. Strickland requires that:

> [T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.
>
> * * *
>
> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . the court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. (Emphasis added).

Strickland at 694-95.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal habeas court must determine whether the state court's decision "was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The court's analysis should center on whether the state courts properly applied the Strickland test. See Williams v. Taylor, 529 U.S. 362 (2000). ("Strickland test provides sufficient guidance for resolving virtually all ineffective assistance of counsel claims.")

An attorney has a duty to make a reasonable factual and legal investigation to develop appropriate defenses. Sneed v. Smith, 670 F.2d 1348 (4th Cir. 1982). The reasonableness of the investigation is evaluated by the totality of the circumstances facing the attorney at the time. Bunch v. Thompson, 949 F.2d 1354 (4th Cir. 1991), *cert. denied*, 505 U.S. 1230 (1992). The Courts recognize limits to investigation based on time, resources, and relevance and conclude that "Strickland does not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Green v. French, 143 F.3d 865, 892 (4th Cir. 1998), *abrogated on other grounds* by Williams v. Taylor, 529 U.S. 362 (1998). A decision not to investigate a particular avenue of defense is assessed by the same standard of "reasonableness in all the circumstances" by which an attorney's performance is measured in other areas. Strickland, 466 U.S. 690-91. A petitioner asserting a claim of ineffectiveness of counsel in failing to investigate must make a showing that the failure was prejudicial. In the capital sentencing context, a defendant has a constitutionally protected right to present the jury with mitigating evidence. The issue in that circumstance is whether, absent counsel's errors, the defendant would not received the death penalty. Williams v. Taylor, 529 U.S. at 398-99.

    a.  Appointment of Counsel

      A discussion of the development and presentation of mitigation during the penalty phase of Shuler's trial begins with a review of the appointment of counsel, Shuler's response to them, and their actions on his behalf. Shuler essentially crippled his attorneys with respect to mitigation defense.

    Shuler was arrested on December 8, 1997, five days after the murder. Marva Hardee Thomas ("Thomas") was appointed to represent Shuler on December 10, 1997. (App. 3898). She

visited initially with Shuler on December 16, 1997. According to Thomas, Shuler was cooperative at first (App. 3899), but he wanted to retain private counsel. She moved for funding on January 9, 1998 and contacted Donna Schwartz-Watts (forensic psychiatrist), Paige Mun Tarr (mitigation specialist), Dr. McKee (forensic psychologist) and Dr. Brannon (neurologist) to assess Shuler. (App. 3903). Thomas was relieved after the Solicitor served notice of the death penalty due to the statutory requirement for five years' experience.[20] Norbett Cumings ("Cummings") was appointed to replace Thomas, and D. Mark Stokes ("Stokes") as appointed as second chair.

Cummings and Stokes decided to "start anew" and not utilize the experts contacted by Thomas. They felt these individuals might be viewed as somehow tainted since they were hired by counsel who did not possess the requisite statutory experience. Further, Schwartz-Watts had begun to testify for the State in sexual predator cases. Instead, Cummings and Stokes retained Robert Miner ("Minter"), an investigator, and Dr. Harold Morgan ("Morgan"), a forensic psychiatrist.

b.    Pretrial Investigations

The pretrial investigation initiated by Thomas was cut short because she was replaced. However, Shuler was interviewed by Schwartz-Watts, Brannon, and Mun Tarr as well as Thomas. The investigation begun by Cummings and Stokes was "limited" because Shuler was non-cooperative. In any event, the following was developed or known by the beginning of the trial:

---

[20]Shortly before trial, Thomas was reappointed to participate in the case, because Shuler was refusing to cooperate with counsel, and he had initially been cooperative with her. (App. 3909).

(1)  Shuler "changed" after the death of his parents.  Shuler's mother died in December of 1995, almost exactly two years before the date of the murder.  At trial, the State called Shuler's wife to testify concerning a handgun previously owned by Shuler's mother.  On cross-examination, she testified that Shuler's parents died within a short period of time of each other and that her husband became quiet and non-communicative. (App. 718-723).  After Shuler was arrested he was "incredibly depressed."  (App. 2893).

(2)  Shuler had used steroids prior to the murder.  The type (pill or injection), amount, and timing were not known.  Schwartz-Watts, in addition to being a forensic psychiatrist, also served as a judge in body-building competitions.  On her initial interview, she recognized Shuler as a competitor from some years earlier and noted that at that time he looked as though he used steroids. (App. 2894-98).  Shuler told Schwartz-Watts that he "had been abusing steroids." (App. 2909).  Brannon also issued a report that Shuler had used steroids in high doses. (App. 3272 and 3423).  Shuler also reported to Cummings that he had used steroids in pill form but had discontinued use the summer before the December murder. (App. 3514, 3710, 3744-46).

(3)  Shuler told Schwartz-Watts that he had begun to use crack-cocaine shortly before the murder. (App. 2909).  Shuler reported the same to Cummings. (App. 3514).

(4)  Shuler reported to the FBI that he contemplated suicide on the early morning prior to the murder.  A "302" reflected this statement and was given to counsel. (App. 4018-19).

(5)  Shuler claimed a loss of memory after he was arrested.[21]  This loss of memory was noted by Schwartz-Watts. (App. 2894), Cummings (App. 3515-20), Stokes (App. 3257-59), Thomas (App. 3912),[22] and others.

(6)  Shuler engaged in bizarre behavior after his arrest.  As discussed above, Shuler was disruptive during his preliminary examination and at his suppression hearing. Cummings testified at the PCR hearing that Shuler was initially cooperative, but later became "like a catatonic person.  He began to say name, rank and serial number like he was a prisoner of war." (App. 3516).  Stokes confirmed Shuler's behavior. (App. 3259).

    c.    The Case In Mitigation

In the words of Shuler's PCR counsel, the case in mitigation was a presentation of "good guy information." (App. 3700).  The defense presented: (1) a prison guard who testified that prior to trial Shuler created a problem on only one occasion. (App. 2193-2202); (2) eight National Guard members who testified that Shuler was a good soldier, dependable, reliable, and that they were shocked at Shuler's arrest (App. 2202-48); (3) Shuler's pastor who testified that Shuler was "kind, gentle-hearted and a God-fearing man" (App. 2250); and (4) Shuler's wife, grandmother and two aunts who testified that he was a loving son and good family man (App. 2255-83).

---

[21]The record shows that Shuler gave detailed information to the FBI after the murder. (App. 4005-25).

[22]Thomas testified at the PCR hearing that after she re-entered the case, she met with Shuler and his family.  Shuler claimed that he did not recognize his wife and children. (App. 3912-13).

d.     PCR Court's Ruling

The PCR court separately addressed these three claims.  The PCR court thoroughly reviewed the evidence presented at the PCR hearing and applied the precedents of the United States Supreme Court to these claims.  With respect to Shuler's claim that counsel failed to develop evidence of steroid abuse and consequent mental impairment (Ground T), the PCR court found that counsel's tactical decision not to pursue this issue after limited investigation was not error under the circumstances of this case.  The PCR court further found that if the decision amounted to error, Shuler had failed to show prejudice. (App. 6508-509).  Similarly, the PCR court rejected Shuler's claims that counsel was ineffective for failing to fully investigate and present evidence of his use of crack cocaine (Ground U) and his contemplated suicide (Ground V).  The PCR court found that counsel made a reasonable tactical decision not to pursue these avenues of potential mitigation because an argument of drug usage was a "double edge sword" when presented to the jury, and presentation of evidence and argument concerning the contemplated suicide and Shuler's mental state would open the door to the introduction of evidence of his malingering. (App. 6513-21).[23]

After being appointed and making initial contact with Shuler, Cummings stated several events occurred which shaped development of the defense case:

1.     Thomas moved to be relieved as counsel as she did not have the requisite experience to represent Shuler as first or second chair counsel. (App. 3905-906).

---

[23]Respondents fully discuss the reasonableness of the PCR court's ruling with respect to Grounds U and V in their memorandum.  Shuler fails to directly discuss these grounds in his memorandum.  Therefore, the undersigned will focus the discussion in this report and recommendation on Ground T.

2.       Stokes was appointed as second chair.

3.       Shuler became completely uncooperative.

4.       Cummings and Stokes jointly decided to "get a fresh start" with development of the mitigation case. (App. 3530). Instead of using the experts initially contacted by Thomas, they retained Dr. Morgan and an investigator, Robert Minter. (App. 3480).

5.       A limited investigation into Shuler's steroid use was undertaken. During the brief period in which he was cooperative with his attorneys, Shuler told Cummings that he had last taken steroids in the summer in 1997 in pill form and that he had obtained the pills from an individual known as "Six" or "Six Pack." Cummings instructed Minter to attempt to locate "Six" and it was discovered that he had been murdered. (App. 3489-90).

6.       Counsel turned over all information, including that which related to Shuler's steroid use to Dr. Morgan and depended on him to advise them of all relevant findings.

7.       By the time Dr. Morgan became involved, Shuler had become completely uncooperative. Dr. Morgan's focus centered on Shuler's competency to stand trial and his capacity to differentiate between right and wrong. As noted above, Dr.

Morgan concluded that Shuler was most likely malingering.[24] Dr. Morgan did not discuss mitigation based on steroid use with counsel.

8.    Prior to the penalty phase, the parties discussed the statutory mitigating circumstances (see S.C. Code Ann. § 16-3-20(C)(b)) upon which the defense would rely. It was stipulated that Shuler had no "significant history of prior criminal conviction involving the use of violence against another person." [§ 16-3-20(C)(b)(1)]. Counsel specifically disclaimed reliance on statutory mitigating factors relating to Shuler's mental or emotional condition at the time of the crimes. [§ 16-3-20(C)(b)(2), (6) and (7)]. (App. 2295-2304).

The PCR court appears to have found the above scenario to be factually accurate. The Court did not specifically delineate findings of fact but appears to have credited the testimony of Cummings and Stokes with respect to pretrial development of mitigation. This may be due in large part because their testimony was basically uncontradicted. Shuler did not testify at the PCR hearing. (App. 3508).[25] The undersigned finds that the findings of fact of the PCR court are supported by the record and entitled to a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). Shuler has not challenged any findings of fact by the PCR court in his present action.

---

[24]Dr. Morgan also felt that Shuler may have been suffering from dissociative amnesia. (App. 409). Dr. Morgan stated his opinion at the competency hearing on October 27, 1998. Interestingly, in April of 2003, Dr. Pope offered a somewhat similar evaluation of Shuler at the PCR hearing. Dr. Pope could not rule out malingering, but testified that Shuler may be exhibiting "factitious amnesia" (a recognized form of amnesia when the "symptom is under the patient's voluntary control.") (App. 2994-3059).

[25]It must be noted that at trial Shuler declined to testify or exercise his right to make a statement to the jury during closing arguments. When questioned by the trial court, Shuler stated he had no memory of the events for which he was on trial. (App. 1813).

The PCR court correctly identified the applicable Supreme Court precedent with respect to Shuler's claim of ineffective assistance of counsel for failing to investigate and present evidence of steroid abuse in mitigation:  Strickland v. Washington, supra; William v. Taylor, supra; and Wiggins v. Smith, 539 U.S. 510 (2003).  Thus, this court must determine whether the PCR court unreasonably applied the principles articulated by the Supreme Court to Shuler's case.  Wiggins, 539 U.S. at 520-21.  The PCR court summarized principles, citing Wiggins:

> (A)s to any claim of ineffective assistance of counsel based on failure to investigate, a particular decision by counsel not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments. In assessing the reasonableness of counsel's investigation, the court must consider not only the quantum of evidence already known to counsel, but also whether such evidence would lead a reasonable attorney to investigate further. Furthermore, counsel's strategic choices made after less than complete investigation are considered reasonable precisely to the extent that reasonable profession judgments support limiting the investigation. (App. 5405) (citations omitted).

The PCR court applied these principles and concluded that the decisions of Cummings and Stokes not to use the experts retained by Thomas and to cease the investigation into steroids after limited investigation were not unreasonable.  The PCR court reasoned that the experts hired by Thomas were tainted because Thomas did not have sufficient qualifying experience under South Carolina law.  In doing so, the PCR court extended the holding of State v. Diddlemeyer, 296 S.C. 235, 371 S.E.2d 793 (1988), *overruled on other grounds* by State v. Torrence, 305 S.C. 45, 406 S.E.2d 315 (1991).  In Diddlemeyer, the Supreme Court held it was error for the trial court not to follow the directives of S.C. Code Ann. § 16-3-26(B) relating to the qualifications of defense attorneys in capital cases.  The PCR court found that "the deprivation of a defendant's right to a fair trial in this context extends logically to the actions of trial counsel." (App. 6507).  The

undersigned does not necessarily agree that the experts hired by Thomas might in some way be tainted.  However, the PCR court further found that counsel was reasonable in hiring another expert and relying on him. (App. 6506).  There is no constitutional right to the effective assistance of an expert witness.  <u>Poyner v. Murray</u>, 964 F.2d 1404, 1418-19 (4th Cir. 1992) and <u>Moody v. Polk</u>, 408 F.3d 141, 150 (4th Cir. 2005).

"In assessing counsel's investigation, we must conduct an objective review of their performance, measured for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the conduct as seen from counsel's perspective at the time.  Every effort [must] be made to eliminate the distorting effects of hindsight." <u>Wiggins</u>, 539 U.S. at 523 (internal citations and quotation marks omitted) and <u>Rompilla v. Beard</u>, 125 S.Ct. 2456, 2462 (2005).  Under this standard, the PCR court's determination that counsel was not ineffective was reasonable.

Counsel knew that Shuler had taken steroids.  However as noted earlier, neither Thomas, Schwartz-Watts, nor any other individual hired by Thomas developed information that Shuler was abusing steroids at or near the time of the murder.  Cummings reasonably relied on the statement of Shuler that he had ceased taking steroid pills during the summer before the murder.  The one lead that was followed, attempting to locate "Six Pack," was fruitless.  Shuler became uncooperative with counsel.  Cummings turned over all the information, including what was known of steroid abuse, to Dr. Morgan.  Shuler did not cooperate with Morgan and could not rule out malingering on the part of Shuler.

Alternatively, the PCR court found that Shuler had failed to show prejudice for not presenting evidence of steroid use.  In doing so, the PCR court discounted Dr. Pope's testimony

48

that "the applicant 'probably' was suffering from psychological effects caused by steroids at the time of the incident." (App. 6509). The PCR court concluded that Shuler's steroid use "was never sufficiently established such that this court would conclude that the applicant's jury would accept the alleged fact [steroid use] as true." (Id.). This conclusion was based on Dr. Pope's testimony that: (1) a high percentage of steroid users showed no change in behavior; (2) steroids in pill form had no effect six to twelve weeks after discontinuance; and (3) effects of all steroids on the personality ended within a few months of discontinuance.

The undersigned concludes that the PCR court reasonably applied the Strickland standard in this case. Underlining this conclusion is the realization that any attempt to show a personality or mental disorder at the time of the crime would necessarily open the door to testimony of Shuler's malingering. All experts who examined Shuler, including Dr. Pope, found evidence that he was malingering. (See App. 6513, n. 21).

    4.    Violations of Brady and Giglio (Ground W)

This claim involves the State's alleged presentation of false testimony and the failure to disclose impeachment evidence pertaining to the testimony of Demond Jones ("Jones"). The main thrust of this claim was raised in the PCR application and addressed by the PCR court. Certain other matters were raised in Shuler's post-PCR hearing memorandum and were discussed in the PCR court's order of dismissal.

As summarized by the South Carolina Supreme Court, Jones was an acquaintance of Shuler. He testified during the first phase of the trial. (App. 741-788). Jones testified that in November of 1997 he bought the rifle, ammunition, and extra clip for Shuler. (App. 748-60). Later, Shuler asked Jones to participate in the robbery, but he refused. (App. 761-64). According

to Jones, Shuler described the armored car procedure and stated that the guard "that's on the back of the truck was an elderly guy." (App. 762).

Jones was charged with federal firearms violations. Prior to Shuler's trial, Jones pled guilty in federal court pursuant to a standard written plea agreement and was sentenced to forty-one month's imprisonment. (App. 742-43). The plea agreement required cooperation, truthful testimony, and gave Jones the opportunity to move for a reduction of sentence pursuant to Rule 35, Fed. R. Crim. P. after Shuler's trial.[26]

Cummings subjected Jones to a vigorous cross-examination. (App. 765-84). Cummings had a copy of the federal plea agreement and used it in his cross-examination.[27] (App. 774). Cummings asked Jones several times if he would be able to seek a sentence reduction based on his testimony at Shuler's trial. Initially, Jones stated, "I'm not promised nothing." (App. 774). The following exchange took place:

> Q. Okay.
> And I'm asking you under oath this morning: Were you not told by either the United States Attorney or your lawyer, Mr. Haley, that if you testified here they would have the right to come back and seek a reduction under the rules of federal court for you if you testified in this hearing today?
> A. No.
> Q. They did not tell you that?
> A. I ain't promised nothing.
> Q. Your understanding you're under oath?
> A. I'm right.
> Q. You're as sure of that last statement as you are about to every other piece of testimony you testified to for the State, are you not, sir?
> A. Say that again.

---

[26]Jones received the reduction after testifying against Shuler.

[27]The plea agreement was not introduced into evidence.

> Q.     You are as sure of that last statement that you just gave this Court and these good jurors as you are about every other item you testified about this morning already?
>
> A.     I wasn't promised anything.

(App. 775).

Shuler asserts that Jones' testimony was untruthful because he had been promised the possibility of a sentence reduction and that the Solicitor failed to correct this testimony.

Due process requires the prosecution to disclose exculpatory evidence to the defendant. Brady v. Maryland, 373 U.S. 83 (1963) as well as impeachment evidence. Giglio v. United States, 405 U.S. 150 (1972). A prosecutor's knowing use of perjured testimony and/or the knowing failure to disclose that false testimony was used to convict a defendant likewise violates due process. United States v. Bagley, 473 U.S. 667 (1985). These principles apply to both the guilt phase and punishment phase of capital trials. Kyles v. Whitley, 514 U.S. 419 (1995). To prevail on a claim based on these cases, a habeas petitioner must show: "(1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) it must have been suppressed by the state, whether wilfully or inadvertently; and (3) it must be material." Spicer v. Roxbury Correctional Institute, 194 F.3d 547, 555 (4th Cir. 1999). Materiality "is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Kyles, 514 U.S. at 434, quoting Bagley, 473 U.S. at 678.

The PCR court applied these principles to this claim. The court concluded that a fair reading of Jones' testimony showed that he was "confused," but that his answer was "technically false." (App. 6542). However, the court noted that the plea agreement containing the Rule 35 sentence reduction language was in the hands of the defense during Jones' cross-examination. (App. 6541-45).

The PCR court, after a thorough analysis, distinguished the present case from <u>Giglio</u> and found that the evidence did not meet Brady's materiality test. (App. 6544). <u>Giglio</u> held that when the credibility or reliability of a witness may be determinative of guilt or innocence, failure to disclosed impeachment evidence denies dues process. In <u>Giglio</u>, the prosecution failed to disclose a promise of leniency to the government's key witness. The PCR court found that Jones was not a critical witness as was the case in <u>Giglio</u> where the witness "was the only witness directly linking Giglio with the crime." (App. 6543). The PCR court found that a "substantial quantity of evidence points to the applicant as the perpetrator of the crimes for which he was convicted." (App. 6545). This coupled with the fact that Cummings "successfully impugned Jones' character"[28] on cross-examination led the PCR court to find that the promise of sentence reduction "would not likely have affected the jury's verdict of guilty nor does it undermine this court's confidence in the verdict's outcome." (App. 6546).

---

[28]This was the finding of the South Carolina Supreme Court on direct appeal. See <u>State v. Shuler</u>, 545 S.E.2d at 817. On direct appeal, Shuler argued that the trial court erred by allowing the State to bolster Jones' testimony by using the plea agreement to show that Jones was required to testify truthfully at Shuler's trial. The Supreme Court found this argument to be without merit and discussed the ways Cummings successfully impeached Jones.

Shuler appears to argue that the failure to correct Jones' testimony was material because it contradicted Shuler's statement to the FBI that he did not know the victim [Brooks] would be in the back of the armored car and he [Shuler] was surprised by his presence. This materiality argument is based primarily on the Supreme Court's statement that "Jones was the State's chief witness who testified Shuler knew Brooks would be in the back of the armored car when the robbery occurred." State v. Shuler, 545 S.E.2d at 816. However, the PCR court carefully reviewed the trial evidence that showed Shuler had knowledge that Brooks would be the rear guard on the armored car. A witness from Anderson Armored Car Service testified that Shuler was a former employee. Their records showed that on three occasions in July of 1997 Shuler was on the same route and on each of these occasions, Brooks was the rear guard. Further, in another statement to the FBI, Shuler "knew there would be armed guards on the armored car and that [he] needed sufficient firepower." (App. 6547). Thus, the PCR court found that Jones' testimony was "cumulative." (Id.).

In his post-PCR hearing memorandum, Shuler raised other claims of failure to disclose evidence which could have been used to impeach Jones. These included a promise that Jones would be housed at FCI-Estill, he failed to comply with a probation requirement that he participate in drug abuse and mental health counseling, and the State did not seek a revocation of his state probation based on the federal firearms convictions. The PCR court discussed these claims and found the failure to disclose this evidence "could not reasonably be taken to put the whole case in such a different light as to undermine confidence in the jury's verdict." (App. 6549).

The undersigned concludes that the PCR court reasonably applied Brady, Giglio and Kyles to Shuler's claim. There was, indeed, overwhelming evidence as to Shuler's guilt. Shuler's

53

argument that his rights were violated because the State failed to correct Jones' false testimony about a possible sentence reduction is greatly undermined because the defense had a copy of the plea agreement and could have put it into evidence to impeach him.  The undersigned concludes that this failure, as well as the failure to disclose the other impeachment evidence discussed above, is immaterial under the standard discussed above.

## Conclusion

Based on a review of the record, it is recommended that respondents' motion for summary judgment be granted, and the petition dismissed without an evidentiary hearing.

Respectfully submitted,

Joseph R. McCrorey
United States Magistrate Judge

November 30, 2005
Columbia, South Carolina