IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | | |
|---|---|---|
| Calvin Alphonso Shuler, #5064, | ) | |
| | ) | C/A No. 3:05-1595-MBS |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **O R D E R and O P I N I O N** |
| Jon E. Ozmint, Commissioner, South | ) | |
| Carolina Department of Corrections, | ) | |
| and Henry McMaster, Attorney | ) | |
| General, State of South Carolina, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Petitioner Calvin Alphonso Shuler is an inmate in the custody of the South Carolina Department of Corrections who currently is under a death sentence. Petitioner seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254, asserting that he is being held in custody unlawfully.

This matter is before the court on Respondents' motion for summary judgment filed September 9, 2005. Petitioner filed a response on October 12, 2005. Respondents filed a reply to Petitioner's response on October 12, 2005.

In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Joseph R. McCrorey for pretrial handling. Judge McCrorey issued a Report and Recommendation on November 30, 2005 in which he recommended that Respondents' motion for summary judgment be granted. Petitioner filed objections to the Report and Recommendation on December 20, 2005.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. Mathews v. Weber, 423 U.S. 261, 270 (1976). The responsibility for

making a final determination remains with this court.  Id.  The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

## I.  FACTS

The facts are discussed in detail in the Report and Recommendation of Magistrate Judge. Briefly, a jury convicted Petitioner on November 9, 1998 of murder, armed robbery, and kidnapping arising from the fatal shooting of James B. Brooks during an armed robbery in Harleyville, South Carolina on December 3, 1997.  Transcript of Trial Proceedings, 2701 (App. 1985).[1]  On November 11, 1998, the penalty phase commenced.  On November 12, 1998, Petitioner was sentenced to death.[2] Petitioner appealed his conviction and sentence, which were affirmed by the South Carolina Supreme Court by published opinion filed April 16, 2001.  See State v. Shuler, 545 S.E. 2d 805 (S.C. 2001).

Petitioner next sought post-conviction relief (PCR) on grounds set forth in his PCR application filed October 29, 2001, and amended three times thereafter.  The matter was heard by

---

[1]

As noted by Magistrate Judge McCrorey, the appendix filed in connection with the petition is fourteen (14) volumes.  Throughout the instant order, the court cites both to the underlying document or transcript as well as reference to cited reference's location in the appendix as "App. ___."

[2]

The transcript of the penalty phase in this case erroneously reflects that Petitioner was sentenced to death on Wednesday, November 11, 1999.  Transcript of Trial Proceedings, 3005 (App. 2289). Petitioner's filings incorrectly reference November 11, 1998 as the date of sentencing.  The court requested that the South Carolina Office of the Attorney General supplement the record to correct this error.  The Attorney General submitted to the court, with a copy furnished to Petitioner's counsel, a duplicate of the sentencing order and an affirmation of death sentence signed by the Honorable Victor Rawl, presiding judge, on November 12, 1998.  Accordingly, the court finds that the date Petitioner was sentenced to death was Thursday, November 12, 1998.

2

the Honorable Daniel F. Pieper in the Court of Common Pleas for Dorchester County commencing on April 21, 2003 and ending on April 25, 2003. The PCR judge denied and dismissed the PCR application by written order entered November 13, 2003. A motion to alter or amend the judgment filed by Petitioner was denied on December 23, 2003.

Petitioner thereafter filed a petition for writ of certiorari to the South Carolina Supreme Court. The South Carolina Supreme Court denied the petition on May 20, 2005. The within petition for writ of habeas corpus was filed on August 4, 2005.

In his petition, Petitioner alleged twenty-five (25) grounds for relief.[3] After a thorough review of the applicable law, Magistrate Judge McCrorey determined that all but six (6) grounds raised by Petitioner are procedurally barred from review.[4] Report and Recommendation, 12-18. Petitioner did not object to the Magistrate Judge's recommendation that only grounds A, B, T, U, V, and W remained for review on the merits. Further, Petitioner did not object to Judge McCrorey's determination on the merits of two of the six surviving claims, grounds A and B. In the absence of objections to the Report and Recommendation, this court is not required to give any explanation for adopting the recommendation. Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983). The court has thoroughly reviewed the Report and Recommendation and concurs in the recommendation of the Magistrate Judge that summary judgment should be granted as to issues "A" through "S," "X" and

---

[3]

Petitioner labeled the grounds alleged for relief alphabetically, "A" through "Y." Petition, 9-40.

[4]

Petitioner raised four issues on direct appeal to the South Carolina Supreme Court. Petitioner notes that the Magistrate Judge initially listed only three issues raised on direct appeal on page three of the Report and Recommendation. Objections, 1. The court finds that this omission was inadvertent as the Magistrate Judge later discussed, on page 18, the four grounds raised on direct appeal and specifically addressed the issue initially omitted. See Report and Recommendations, 18.

"Y."

Accordingly, the claims before the court for review are as follows:

Ground T[5]: Counsel was ineffective for failing to investigate and present available evidence in mitigation the Petitioner was abusing anabolic androgenic steroids (AAS) and to generate expert health testimony regarding AAS abuse in support of a life sentence in violation of the Sixth, Eighth, and Fourteenth Amendments, Strickland v. Washington, 466 U.S. 668 (1984).

Ground U: Counsel failed to investigate and present at sentencing available evidence that immediately prior to the offense the Petitioner had consumed "crack" cocaine and had developed other substance abuse disorders which reasonable attorney performance required to be presented in violation of Strickland v. Washington, 466 U.S. 668 (1984) and the Sixth, Eighth, and Fourteenth Amendments.

Ground V: Counsel failed to provide to his mental health expert and present at sentencing available evidence that immediately prior to the offense the Petitioner had attempted suicide notwithstanding the defense's presentation during sentencing Petitioner immediately prior to the offense was severely depressed. Reasonable attorney performance required this significant evidence of mental illness to be developed and presented at sentencing in violation of Strickland v. Washington, 466 U.S. 668 (1984) and the Sixth, Eighth, and Fourteenth Amendments.

Ground W: The prosecution violated the Fifth, Eighth, and Fourteenth Amendments, Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963); Kyles v. Whitley, 514 U.S. 419, 437 (1995), when they failed to correct testimony presented to Petitioner's jury which they knew or should have known was not factual.

Petition, 28-31.

## II. LAW/DISCUSSION

The petition is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), which became effective on April 24, 1996. An application for a writ of habeas corpus with respect to a claim that was adjudicated on the merits in State court proceedings cannot be granted unless the adjudication of the claim:

[5] The court labels the claims as they were initially designated in Petitioner's initial motion, referenced in the Report and Recommendation, and raised in Petitioner's Objections.

4

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to . . . clearly established Federal law, as determined by the Supreme Court," id., "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). A state court decision "involve[s] an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court," 28 U.S.C. § 2254(d)(1), when the state court "identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. A determination of a factual issue made by a State court is presumed to be correct. 28 U.S.C. § 2254(e)(1). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Id.

A writ of habeas corpus will not issue simply because a federal habeas court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (quoting Williams v. Taylor, 529 U.S. 362 (2000)). The court must uphold the state court determination unless its

"independent review of the record and pertinent federal law persuades [it] that [the state court's] result contravenes or unreasonably applies clearly established federal law, or is based on an unreasonable determination of the facts in light of the evidence presented . . . . [The court's] review is in fact deferential because [the court] cannot grant relief unless the state court's *result* is legally or factually unreasonable."

5

Id. at 163 (quoting Aycox v. Lytle, 196 F.3d 1174, 1178 (10th Cir. 1999)).

**A.  Grounds T, U, V- Ineffective Assistance of Trial Counsel[6]**

    1.  Steroid Use

Petitioner asserts that the Magistrate Judge erred in recommending a finding that trial counsel was not deficient for failing to develop additional facts regarding Petitioner's alleged drug use and mental state at the time of the incident.  Petitioner argues that trial counsel's failure to pursue these potential avenues of mitigation resulted in the sentencing jury receiving an incomplete "representation of Petitioner as he was at the time of the crimes alleged . . . ."  Objections, 8.  The court disagrees.

To prove ineffective assistance of counsel, Petitioner must show that trial counsel's performance was not reasonable under prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  To succeed, Petitioner must overcome "[the] presumption that 'counsel's conduct falls within the wide range of reasonable professional assistance.'"  Byram v. Ozmint, 339 F.3d 203, 209 (4th Cir. 2003) (quoting Strickland, 466 U.S. at 689).  Further, Petitioner must demonstrate that he was prejudiced by trial counsel's deficient performance, in that because of trial counsel's unprofessional errors, the result of the proceeding would have been different.  Strickland, 466 U.S. at 694.

In death penalty cases, defense attorneys are required to undertake a reasonable investigation

---

[6]

Petitioner responded to the Magistrate Judge's Report and Recommendation by consolidating his objections to the Magistrate Judge's recommendation regarding these three grounds into one general argument.  The court addresses his ineffective assistance of counsel claims by analyzing them in the specific factual context outlined in Petitioner's § 2254 petition.

into possible mitigating evidence that can be presented during the penalty phase. Wiggins v. Smith, 539 U.S. 510, 523 (2003). The duty to investigate was best summarized by the Court in Strickland:

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 691. To determine whether counsel "exercised reasonable professional judgment," the court must "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable." Wiggins, 539 U.S. at 522-23 (internal citations omitted). As the Court in Wiggins noted, "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing . . . ." Id. at 533.

Petitioner's claim is based on facts arising from a chain of events starting shortly after appointment of Petitioner's first attorney, Marva Hardee-Thomas ("Hardee-Thomas"). Hardee-Thomas was replaced after the State of South Carolina notified Petitioner of its intent to seek the death penalty. Hardee-Thomas informed the court that she did not have the requisite experience expressly mandated by statute to represent a defendant facing the death penalty. Objections, 2; Order Denying Post-Conviction Relief, 65 (App. at 6495). Prior to her replacement as counsel, Hardee-Thomas retained the services of several experts in preparation for the presentation of mitigating factors at sentencing. Order Denying Post-Conviction Relief, 64 (App. at 6494) (quoting PCR Hearing Transcript, Volume 1, 38 (App. 2885)).

One expert retained by Hardee-Thomas was Dr. Donna Schwartz-Watts, who is qualified in the field of forensic psychiatry. Id. Dr. Schwartz-Watts testified at the post-conviction hearing that

7

she was informed by Petitioner during her 1998 evaluation of him that Petitioner had used steroids. Id. at 65 (App. at 6495) (quoting PCR Hearing Transcript, Volume 1, 62 (App. 2909)). This admission came after Dr. Schwartz-Watts suspected Petitioner may have used steroids based upon both her observations of Petitioner's physical size during their initial meeting, and after recalling Petitioner's appearance, years earlier, in a body-building competition she judged. Id.

Hardee-Thomas was replaced as trial counsel by Norbert Cummings ("Cummings"). Cummings was assisted by Doyle Mark Stokes ("Stokes"). PCR Hearing Transcript, Volume 1, 401 (App. 3250). Cummings and Stokes were also aided by an investigator, Robert Lowe Minter ("Minter"). Id. at Volume 2, 138 (App. 3480). Cummings chose not to retain the experts hired by Hardee-Thomas. Cummings stated at the PCR hearing that he made this decision because he did not want his representation of Petitioner to be "tainted" by Hardee-Thomas's failure to meet the statutory qualifications. Order Denying Post Conviction Relief, 73 (App. 6503) (quoting PCR Hearing Transcript, Volume 3, 149 (App. 3709)).

Trial counsel replaced Dr. Schwartz-Watts with his own expert, Dr. Harold Morgan. PCR Hearing Transcript, Volume 2, 76 (App. 3418). Dr. Morgan indicated at the PCR hearing that he was hired "to consult with the defense with respect to the sanity and the competency of [Petitioner] . . . ." Id. at 75 (App. 3417). Dr. Morgan stated that he conferred with Dr. Schwartz-Watts and that she informed him of Petitioner's possible use of steroids. Id. at 80, 91 (App. 3422, 3433). However, Dr. Morgan indicated that he didn't recall "discussing with [Cummings or Stokes] or raising any issues with regard[] to [Petitioner's] substance abuse." Id. at 84 (App. 3426).

Petitioner first asserts that Cummings' justification for discharging the experts hired by Hardee-Thomas is "nonsensical." Objections, 2. The PCR judge thoroughly reviewed trial counsel's

decision not to retain the services of the experts hired by Hardee-Thomas.  Order Denying Post-Conviction Relief, 76-77 (App. at 6506-07).  The PCR judge noted the case law in South Carolina stating that a trial court's failure to enforce the statutory requirements mandating the experience required to represent individuals in capital cases deprives a defendant of the right to a fair trial.  Id. at 77 (App. 6507).  He logically extended this proposition to actions taken by trial counsel, and noted that "[Cummings'] strategic decision to 'start fresh' without the 'taint' of an unqualified attorney's actions . . . fell within the wide range of reasonable professional assistance."  Id.  In the court's view, the PCR judge's ruling that Petitioner was not denied effective assistance of counsel with respect to this issue neither was contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).

Petitioner next argues in his objections that Dr. Morgan "claims he was never provided any information about steroid use or drug use from trial counsel."  Objections, 5.  The PCR judge noted evidence to the contrary, including Cummings' testimony that Cummings "specifically remembered providing information to Dr. Morgan with respect to steroids" and that he "turned over his notes and entire file to Dr. Morgan."  Order Denying Post Conviction Relief, 73 (App. 6503).  The PCR judge also repeated Cummings' testimony that Cummings instructed Dr. Morgan to use these notes and information and "do whatever a good psychiatrist does."  Id. at 73 (App 6503).  To the extent that Petitioner challenges the PCR judge's finding that Dr. Morgan was unaware of Petitioner's alleged steroid use,  Petitioner has not met his burden of rebutting the presumption of correctness afforded the determination of factual issues made by the State court.  See 28 U.S.C. § 2254(e)(1).

Petitioner next contends that counsel's performance was deficient because he never presented

9

the use of steroids as a possible mitigating factor at sentencing. Cummings explained this decision at the PCR hearing by testifying that "he had reservations [about how] . . . saying that a healthy, young, grown male who self abuses something . . . which is illegal . . . to bulk up might have impacted the jury." PCR Hearing Transcript, Volume 2, 188-89 (App. 3530-31). He also stated that he "had concerns" about putting "the psychiatrist up on the stand [to discuss the effects of drug use]" because it may have led to evidence being presented that Petitioner was "malingering,"[7] which was an opinion shared by numerous health professionals involved in the matter.[8] Id. at 189 (App. 3531).

In addressing the issue, the PCR judge first found that trial counsel knew of Petitioner's self-reported use of steroids. Order Denying Post Conviction Relief, 72, 75(App. 6502, 6505). The PCR judge noted that Cummings was "aware [from research] that some persons could obtain brain damage and subsequently die from voluntary abuse of steroids." Id. at 73 (App. 6503). He determined that Cummings pursued Petitioner's steroid use "in a limited capacity" and told Minter

---

[7]

Malingering is defined as "feign[ing] illness or disability . . . ." Black's Law Dictionary 978 (8th ed. 2004).

[8]

The issue of Petitioner's alleged malingering was raised frequently during trial and in state post-conviction proceedings. As the PCR court noted, Dr. Schwartz-Watts testified that Dr. Brannon, another health professional who examined Petitioner, indicated in a report that Petitioner may have been "malingering" or at least exhibiting behavior inconsistent with any kind of neurological deficit. PCR Hearing Transcript, Volume 1, 80-81 (App. 2927-28). Cummings also noted that one of the reasons he wanted to "start fresh" was because "they've already got some medical professional that is already saying that [Petitioner] is faking up there and malingering and hindering our helping him." PCR Hearing Transcript, Volume 2, 189 (App. 3749). Prior to trial, Dr. Morgan testified that Petitioner was exhibiting signs of "malingering" during trial preparation. Transcript of Pre-trial Motions, 383, 387 (App. 405, 409). Dr. Harold Pope, an expert retained by Petitioner to offer testimony of steroid use and its effects during the post-conviction hearing, stated that he could not rule out malingering on the part of Petitioner but also opined that Petitioner's condition may possibly be a "factitious disorder" where symptoms are "intentionally produced or feigned." PCR Hearing Transcript, Volume 1, 206-12 (App. 3053-59).

to attempt to locate "Six" or "Six Pack," the individual who allegedly supplied Petitioner with steroids. Id. at 72-73 (App. 6502-03). Though his investigator was never specifically told to search for evidence of steroid abuse by Petitioner, he did attempt to locate "Six" or "Six Pack," but learned he was deceased. Id. at 75 (App. 6505). Most notably, the PCR court explicitly highlighted Cummings' testimony that "if Dr. Morgan had provided the defense with information other than that [Petitioner] was malingering or had selective memory, Cummings 'probably would have done more on it.'" Id. at 76 (quoting PCR Hearing Transcript, Volume 3, pp. 201-202) (App. 3761-62)).

The PCR judge also recounted the testimony of Stokes, who stated that he believed Petitioner's "use of steroids to be 'casual.'" Id. at 77 (App. 6507). The PCR judge referred to the testimony of Cummings, who stated that Petitioner informed him that "[Petitioner] was not using steroids at the time of the incident and that he never developed any information prior to trial that Petitioner was using steroids by injection." Id. Applying Strickland, the PCR judge determined that "counsel's reliance on [Petitioner's] statements that '[Petitioner] took some steroid pills' during the summer of 1997, months before the subject incident, did not fall below an objective standard of reasonableness." Id. at 78 (App. 6508).

Petitioner appears to argue that the PCR judge incorrectly determined the extent to which Cummings knew of Petitioner's steroid use. Specifically, Petitioner avers that Cummings learned of intravenous steroid abuse by Petitioner immediately prior to the incident from Dr. Schwartz-Watts. Petitioner states that Cummings "admitted that he was unaware that, during the interview [of Petitioner], Dr. Schwartz-Watts was able to obtain a self report that he had been using steroids heavily prior to this offense." Objections, 4. Petitioner states that "Dr. Schwartz-Watts had a telephone conversation with [Cummings] and . . . informed trial counsel of the history she had

11

gathered concerning steroid abuse, not only pills but intravenous abuse." Id. at 7.  To the extent

Petitioner argues the PCR judge incorrectly determined the facts, the court disagrees.

A portion of the hearing transcript quoted by Petitioner reveals the following exchange:

Q (by Petitioner's Attorney on PCR, Mr. Nickerson): Mr. Cummings, at the time you decided to start anew, did you understand that it was Dr. [Schwartz-Watts'] opinion from having viewed this man in bodybuilding competition that he was using anabolic steroids?

. . . .

A (by Cummings): No. As you said, I had no direct communication with her.  I spoke with [Hardee-Thomas] and that was the extent of it, sir, as you pointed out.

Q: Mr. Cummings, were you aware that during the interview of this man by Dr. Schwartz-Watts she was able to obtain a self report that [Petitioner] had been using steroids heavily prior to this offense?

A: No.

Transcript of PCR Hearing, Volume 3, 150-151 (App. 3710-11).

The court notes that the dialogue referenced by Petitioner misrepresents the actual testimony

of Dr. Schwartz-Watts by implying that she secured a "self-report" from Petitioner that he was using

steroids heavily *immediately* prior to this offense.  The record does not reflect such an exchange.

To the contrary, while Dr. Schwartz-Watts noted that Petitioner shared a history including the use

of steroids, the record does not evidence exactly how close in time to the incident the alleged self-

reported steroid use occurred.  The text of the exchange is as follows:

Q (by Petitioner's Attorney on PCR, Mr. Nickerson): Now, in 1998, you take - - you conduct your evaluation of [Petitioner].  You remember seeing him compete in [a bodybuilding competition].  Did [Petitioner] also provide you a history of his use of substances?

A (by Dr. Schwartz-Watts): Yes, he did.  I asked him specifically had he used steroids because I suspected it and I remembered seeing him in the competition previously that that was a suspicion of mine, so I asked him directly.

Q: And [Petitioner's] response to that was?

A: Yes, he did.

Q: Okay. And can you tell us what other substances you recall?

A: Yes. He clearly stated the history that he had been abusing steroids, that he got in a fight with a coworker. He was subsequently shot. His mother died. His father died a short time later. And basically the gist of the interview was that [Petitioner] blamed himself and his steroid use for all of the losses he suffered.

PCR Hearing Transcript, Volume 1, 61-62 (App. 2908-09).

Later, Dr. Schwartz-Watts responded to additional questions regarding the transfer of information to Cummings concerning Petitioner's alleged steroid use:

Q: [D]id you have any communication, verbal communication with Mr. Cummings about what you had done in terms of your evaluation of with [Petitioner]?

A: Yes, I did.

Q: Okay. And can you describe that for us?

A: Sure. I spoke with him by telephone and told him again that [Petitioner,] in my opinion, [Petitioner] had a severe major depression that needed treatment immediately, and I also informed him of the history I had gathered at this point including his steroid abuse.

Id. at 69 (App. 2916).

The court notes that these exchanges leave to question exactly *how far* in advance of the incident Petitioner allegedly used steroids. Indeed, there may be no confusion at all as both Cummings and Dr. Schwartz-Watts recognized that Petitioner used steroids *at some point* prior to the incident. However, to the extent Petitioner alleges the testimony of Dr. Schwartz-Watts is inconsistent with that of Cummings, Petitioner has not met his burden of rebutting the presumption of correctness afforded the determination of factual issues made by the State court. See 28 U.S.C. § 2254(e)(1).

13

The court has thoroughly reviewed the record and finds that the PCR judge accurately summarized the facts relating to Petitioner's argument concerning steroid use.  The PCR judge applied the relevant Supreme Court case law to the facts.  Accordingly, the court finds the PCR judge's ruling that counsel's decision not to further investigate or present evidence of Petitioner's alleged use of steroids was reasonable, was not contrary to, nor involved an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  The decision  was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  Id.

The PCR judge also held that even if trial counsel was unreasonable with respect to the investigation of Petitioner's alleged use of steroids,  Petitioner failed to "meet his burden of proving that he was prejudiced by his attorney's allegedly deficient performance," thus failing the second prong of the Strickland test.  Order Denying Post Conviction Relief, 78 (App. 6506).  In so doing, the PCR judge recounted the testimony of Dr. Harrison G. Pope, who testified on Petitioner's behalf at the PCR hearing.  Dr. Pope is "an expert qualified in the field of forensic psychiatry with a specialty in anabolic androgenic steroids and their effects on the human body." Id. at 66 (App. 6496) (quoting PCR Hearing Transcript, Volume 1, 143 (App. 2990)).  Petitioner relies on the testimony of Dr. Pope to establish that the outcome of the proceedings would have been different had the jury heard a thorough presentation of Petitioner's alleged steroid abuse during sentencing.  As the PCR judge noted, Dr. Pope testified that his personal investigations have revealed that individuals "who take very large doses of anabolic steroids develop hypomanic or manic syndromes that develop into major depressive syndromes upon withdrawal of steroid use." Id. Dr. Pope opined that those with "hypomanic or manic syndrome . . . often do things an individual would not normally do." Id. Dr.

Pope further stated that "individuals who become manic could become uncharacteristically irritable, aggressive, and even violent, even when they have no past history of such behavior." Id. at 67 (App. 6497) (quoting PCR Hearing Transcript, Volume 1, 160 (App. 3007)).

As the PCR judge stated, Dr. Pope concluded "that most probably the applicant was suffering from a mental or emotional disturbance caused by anabolic steroid ingestion at the time of the offense . . . ." Id. at 68 (App. 6498). Dr. Pope stated that "[Petitioner's] capacity to conform his conduct to the requirements of the law was substantially impaired, and that [Petitioner] was of impaired mentality at the time of the offense." Id. (quoting PCR Hearing Transcript, Volume 1, 201-206 (App. 3048-53)). The PCR judge adequately recounted the basis of Dr. Pope's opinion including Petitioner's own admission to using steroids to Dr. Schwartz-Watts, Petitioner's alleged "bragging" about the use of steroids to colleagues at the gym, and certain "bizarre" and "aggressive" behavior exhibited by Petitioner. Id. at 67 (App. 6497) (quoting PCR Hearing Transcript, Volume 1, 179, 174-78 (App. 3026, 3021-25)). The PCR judge recounted Dr. Pope's testimony that a friend of Petitioner indicated that Petitioner "would 'get humongous' right at the time of PT testing for the National Guard, which in 1997 occurred in November." Id. (quoting PCR Hearing Transcript, Volume 1, 181, App. 3028)). The PCR judge also noted Dr. Pope's reference to Petitioner's son's alleged discovery "of a needle and a small jar with a tin top" in Petitioner's shaving bag. Id. Finally, the PCR judge summarized a litany of incidents involving Petitioner that Dr. Pope testified represented "a progression in [Petitioner's] 'aggressive' behavior . . . ." Id. at 67-68 (App. 6497-98) (quoting PCR Hearing Transcript, Volume 1, 191-98 (App. 3038-45)).

The PCR judge referenced the testimony of Dr. Pope on cross-examination when Dr. Pope stated that "when a person has been off of steroids for a period of a few months, the person turns to

15

a normal personality and does not again develop abnormalities until they next take steroids." Id. at 68 (App. at 6498) (quoting PCR Hearing Transcript, Volume 1, 216-17 (App. 3063-64)). According to the PCR judge, "Dr. Pope also testified that evidence of [Petitioner's] threatening of correctional officers months after [Petitioner's] arrest had no effect on [Dr. Pope's] opinion." Id. (quoting PCR Hearing Transcript, Volume 1, 226-27 (App. 3073-74)). Further, the PCR judge recounted Dr. Pope's testimony that "in a study of fifty individuals taking six hundred milligrams of steroids per week, forty-two of such individuals showed no changes in their behavior." Id. (quoting PCR Hearing Transcript, Volume 1, 234-35 (App. 3081-82)). After reciting the testimony of Dr. Pope, the PCR judge held that "[d]espite the evidence presented by [Petitioner] that [he] 'probably' was suffering from psychological effects caused by steroids at the time of the incident, such fact was never sufficiently established such that this court would conclude that the applicant's jury would accept that alleged fact as true." Id. at 79 (App. 6509).

The PCR judge went on to compare the instant case with the decision of the Tenth Circuit Court of Appeals in Sallahdin v. Gibson, 275 F.3d 1211 (10th Cir. 2002). In Sallahdin, the petitioner for a writ of habeas corpus argued that he received ineffective assistance of counsel when his attorney failed to investigate or present evidence concerning the use of steroids. Id. at 1233. The Tenth Circuit concluded, after reviewing a record including the testimony of Dr. Pope addressing the effects of steroids, that "there is a reasonable probability that the presentation of Dr. Pope's testimony could have altered the outcome of the sentencing phase . . . ." Id. at 1240. However, the court continued, "we are unable at this point to conclude that Sallahdin was denied his right to effective assistance of counsel . . . ." Id. The Tenth Circuit concluded by noting that "[it] cannot say that presentation of a steroid-use defense was without risk of negative consequences, or was the only

16

reasonable [mitigation stage] strategy that trial counsel could have adopted." Id. Accordingly, the Tenth Circuit remanded the case to the district court "to conduct an evidentiary hearing on the issue of trial counsel's performance" as it was "imperative to determine trial counsel's reasons, or lack thereof, for presenting Dr. Pope's testimony [during sentencing]." Id.

In reviewing the Sallahdin decision, the PCR judge determined that "the Sallahdin court engaged in a Strickland analysis in reverse, analyzing the prejudice aspect of Sallahdin's allegation prior to its analysis of the reasonableness of trial counsel's actions." Order Denying Post-Conviction Relief, 81 (App. at 6511). The PCR judge recognized the difference between the Sallahdin case and the instant matter was that the record in Petitioner's case revealed that "counsel made a reasonable strategic decision not to pursue an investigation into the applicant's steroid use based on information provided them by the applicant . . . ." Id. Further, the PCR judge distinguished the facts of the Sallahdin case. Id. at 81-83 (App. 6511-13). The PCR judge also noted that the impact of Dr. Pope's testimony in Petitioner's case was diminished by his "concession regarding the study of fifty individuals taking six hundred milligrams of steroids per week wherein forty-two of such individuals showed no change in their behavior . . . ." Id. at 82 (App. 6512). Ultimately, the PCR judge stated, "notwithstanding the obvious similarities between Sallahdin and [Petitioner's case], the court finds that [Petitioner] has failed to meet his burden of proving that a reasonable probability exists that but for counsel's alleged failure to adequately investigate [Petitioner's] steroid use, [Petitioner's] jury would have concluded that the consideration of mitigating and aggravating circumstances did not warrant death." Id. at 83 (App. 6513).

The court finds the PCR judge's ruling that Petitioner did not show prejudice resulting from counsel's decision not to present evidence of steroid use was supported by facts from the record as

well as a reasoned analysis distinguishing a relevant decision by the Tenth Circuit.  The PCR judge's ruling on this issue was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  See 28 U.S.C. § 2254(d).  It was based on a reasonable determination of the facts in light of the evidence presented in the state court proceeding and thus is presumed to be correct.  Petitioner's objection is without merit.

2.  Use of "Crack" Cocaine

Petitioner next argues that the Magistrate Judge erred in recommending a finding that trial counsel was not deficient for failing to develop additional facts regarding Petitioner's alleged use of cocaine.  Petitioner challenges the Magistrate Judge's recommendation to uphold the PCR judge's ruling that counsel was not ineffective for allegedly failing to investigate and present at sentencing evidence indicating that, immediately prior to the incident, Petitioner allegedly consumed "crack" cocaine.  The court disagrees.

The PCR judge found that Stokes and Cummings were aware of Petitioner's alleged use of cocaine.  Order Denying Post Conviction Relief, 83-84 (App. 6513-14) (quoting PCR Hearing Transcript, Volume 1, 419-420, (App. 3268-69); Volume 3, 186 (App. 3746)).  The PCR judge referenced Stokes' testimony that "the defense team discussed the possibility of [Petitioner's] drug use as a mitigating circumstance."  Id. at 84 (App. 6514) (quoting PCR Hearing Transcript, Volume 1, 467-469 (App. 3316-3318)).  The trial transcript reveals the following exchange between Creighton Waters, attorney for Respondent, and Stokes:

Q (by Waters): Just to reiterate, you did, in fact, talk about drug abuse, correct, as you prepared for this trial?

A (by Stokes): I think it would be more accurate to say drug use.

Q: Drug use?

A: Yes.

Q: And you decided as a strategic matter that you did not want to raise that; is that correct?

A: That's correct.

Q: And that was for the reasons that we've talked about that it could potentially be a two-edged sword; is that correct?

A: Yes.

PCR Hearing Transcript, Volume 1, 469 (App. 3318).

Although the PCR judge noted Stokes' acknowledgment that the defense may have chosen to present evidence of drug use "if there were some side effect from [it] . . . ," the PCR judge placed this comment in context with other evidence in the record. Specifically, the PCR judge recognized Stokes' admissions regarding the possibility that Petitioner's alleged "mental and emotional deficiencies were the result of malingering." Order Denying Post Conviction Relief, Volume 1, 84-85 (App. 6514-15) (citing PCR Hearing Transcript, Volume 1, 470 (App. 3319)). The PCR judge then cited to Stokes' testimony that Stokes feared that the possibility of presenting evidence of mental and emotional difficulties stemming from the use of drugs would open the door to the government presenting evidence that Petitioner was malingering. Id. (citing PCR Hearing Transcript, Volume 1, 474 (App. 3323)). The record reveals the following exchange:

Q (by Waters): . . . Would it be fair to say that in your consideration of presenting any kind of mental health defense you would be very concerned that once you did that you would be opening the door to all of the testimony about the [Petitioner's] malingering. Is that fair to say?

A (by Stokes): Absolutely.

. . . .

19

Q: And is it fair to say that there would be a significant risk that the solicitor could make a whole lot of all of that if it, in fact, came out in the penalty phase?

A: Yes, sir.

Q: And is it fair to say that putting it up would open the door for the solicitor to do that?

A: It would.

PCR Hearing Transcript, Volume 1, 474 (App. 3323).

The PCR judge also cited to Cummings' description of the defense team's reservations about presenting evidence of Petitioner's alleged use of "crack." Order Denying Post Conviction Relief, 84-85 (App. 6514-15) (quoting PCR Hearing Transcript, Volume 2, 184-192) (App. 3526-3534)). The record reflects Cummings' contemplation of the effects of drug use as a mitigating factor and evinces his reasoning for choosing not to present it:

Q (by Waters): Okay. Do you recall talking with Doctor Morgan about substance abuse at all?

A (by Cummings): I believe, sir, we informed Dr. Morgan - - I don't just say we - - I. I know that we talked to him about some substance abuse by [Petitioner], yes, sir.

. . . .

Q: . . . With regard to substance abuse . . . , was there a concern for you in this particular case as to how the state might respond if you were to go forward with that kind of defense?

A: . . . Substance abuse, of course, if it's a voluntary action, if it is a - - here we are getting drunk-up or cracked-up and then going and pulling a felony. Of course, we both had reservations of presenting that in trial. . . .

PCR Hearing Transcript, Volume 2, 184, 190 (App. 3526, 3532).

Further, as the PCR judge noted, Cummings feared discussing Petitioner's mental health because he did not want to "open the door" to testimony of Petitioner's alleged malingering:

And the other issue I had, sir, is whether or not - - and, again later on, you touched on the

20

word about malingering. Yeah, I was very concerned about putting a professional up on the stand and then having the solicitor have a field day eliciting to the jury that somebody might have been malingering, faking, and everything else. So, yes, sir, I had a dual quandary.

PCR Hearing Transcript, Volume 2, 191 (App. 3533) (cited in Order Denying Post Conviction Relief, 85 (App. 6515)).

After noting the above testimony, the PCR judge found that "the applicant's counsel made a reasonable investigation into the consequences of the applicant's use of crack cocaine by presenting such to their defense expert and made a strategic decision not to use the applicant's use of crack cocaine as a mitigating factor at sentencing." Order Denying Post Conviction Relief, 85 (App. 6515). The PCR judge, referencing earlier citations to the applicable case law, noted that "decisions made by counsel not to present evidence in light of accompanying harmful evidence . . . do not fall below an objective standard of reasonableness." Id. (citation omitted). Ultimately, the PCR judge held that "[Petitioner] [] failed to overcome the strong presumption that these informed tactical decisions were reasonable under the circumstances." Id.

The court has reviewed the PCR judge's ruling on the alleged failure to provide effective assistance of counsel by failing to present evidence of Petitioner's alleged use of "crack" cocaine. The court notes that the PCR judge correctly identified the established federal law on the subject and reasonably applied it to the instant facts. Accordingly, the PCR judge's ruling that Petitioner was not denied effective assistance of counsel with respect to this issue was not contrary to, nor involved an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d). Further, the PCR judge's ruling on this issue was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Id. Petitioner's objection is without merit.

21

3.  Petitioner's Alleged Attempt to Commit Suicide Prior to the Offense

Petitioner next contends that the Magistrate Judge incorrectly recommended dismissing Petitioner's claim that trial counsel was ineffective in failing to present evidence at sentencing that Petitioner attempted to commit suicide in the early morning hours prior to the incident.  Similarly, Petitioner argues that the PCR judge erred in dismissing Petitioner's argument that counsel failed to present Dr. Morgan with evidence of Petitioner's alleged suicide attempt found in an FBI report.[9] The court disagrees.

FBI agent David Alan Espie, III filed a report on December 12, 1997 indicating that Petitioner claimed to attempt suicide by placing the assault rifle used in the incident in his mouth and pulling the trigger.  Order Denying Post Conviction Relief, 86 (App. 6516).  The PCR judge noted that Dr. Morgan testified that he "was unaware of any information that [Petitioner] had put [an assault rifle] in his mouth on the night of the incident and pulled the trigger."  Id. (quoting PCR Hearing Transcript, Volume 2, 92 (App.  3434)).  The PCR judge also noted the contradictory testimony of Stokes indicating that Dr. Morgan was presented either with a physical copy of the FBI report, or was told about the contents of the report.  Id. (quoting PCR Hearing Transcript, Volume

---

[9]

Petitioner states:

> There seems to be a conflict in testimony, trial counsel claiming that he provided the relevant mitigation evidence to his mental health expert, and the mental health expert denying that this information was provided, furthermore denying that he was even approached about pursuing possible avenues of mitigation.  The end result is Petitioner suffers.

Objections, 6.  The court construes this as a challenge to the Magistrate Judge's Report and Recommendation.

1, 484 (App. 3333); PCR Hearing Transcript, Volume 2, 37 (App. 3379)). The PCR judge also referenced the testimony of Cummings indicating that he had informed Dr. Morgan of the contents of the report. Id. at 88 (App. 6518). Cummings testified at the PCR hearing that he both shared the contents of the FBI file with Dr. Morgan and spoke with Dr. Morgan about Petitioner's alleged attempted suicidal tendencies:

> Q (by Waters): Do you recall ever talking with Dr. Morgan about the contents of Mr. Shuler's statement to the FBI?
>
> A (by Cummings): Yes sir, I do. . . .
>
> . . . .
>
> Q: Do you recall talking with Dr. Morgan about any depression or suicidal ideation that Mr. Shuler had exhibited?
>
> A: Yes, sir. . . .

PCR Hearing Transcript, Volume 3, 182-83 (App. 3524-25).

The PCR judge's ruling reflects that he thoroughly reviewed the perceived conflicting testimony of Dr. Morgan, Cummings, and Stokes regarding the FBI report. Order Denying Post Conviction Relief, 90 (App. 6520). The PCR judge concluded that "counsel's recollection of whether evidence of [Petitioner's] purported suicide attempt was relayed to Dr. Morgan [is] a more credible reflection than that of Dr. Morgan's." Id. Petitioner objects to this conclusion by basically restating Dr. Morgan's testimony that counsel failed to inform him of Petitioner's alleged suicide attempt. Objections, 6. However, the court notes that the PCR judge was present during the testimony of all witnesses and was in the best position to assess their credibility. Thus, the court finds that Petitioner has not met his burden of rebutting the presumption of correctness afforded the determination of factual issues made by the State court. See 28 U.S.C. § 2254(e)(1). The court

23

upholds the PCR court's determination that counsel shared with Dr. Morgan the contents of the FBI file including the description of the alleged suicide attempt.[10]

The PCR court also held that counsel's decision not to present evidence of Petitioner's alleged suicide attempt "fell within the wide range of reasonable professional assistance." Order Denying Post Conviction Relief, 90 (App. 6520). This conclusion followed a detailed recitation of counsel's explanations for choosing not to offer such testimony during sentencing. Id. at 86-90 (App. 6516-20). The PCR judge largely credited counsel's repeated assertion "that their decision

---

[10]

The court notes that a question posed by Waters at the PCR hearing implies a purported suicide attempt by Petitioner in the evening hours following the incident. See PCR Hearing Transcript, Volume 2, 92 (App. 3434) ("[Petitioner] put [an assault rifle] in his mouth *on the night of the incident* and pulled the trigger.") (emphasis added). As noted, the statement describing the alleged suicide attempt underlying Waters' question to Dr. Morgan was contained in a report created by the F.B.I. documenting a December 8, 1997 interview with Petitioner. The transcript of the PCR hearing reveals the following exchange:

> Q (by PCR Judge): Were you asking [Dr. Morgan] if he had been given oral statements?
>
> A (by Waters): No. I was asking him if he recalled any oral discussions of this FBI report or receiving the statement itself. . . .

PCR Hearing Transcript, Volume 2, 94 (App. 3436). The F.B.I. Report referenced by counsel indicates that the purported suicide attempt occurred in the morning prior to the incident. See F.B.I. Report, Petitioner's PCR Exhibits, Attachment 2, 5-6 (App. at 4018-19) ("Sometime after midnight into the early morning hours of Wednesday, December 3, 1997 . . . [Petitioner] placed barrel of [the] rifle into his mouth and pulled the trigger."). Thus, the PCR judge reasonably concluded that the question posed by counsel referenced an attempted suicide by Petitioner occurring in the early morning hours preceding the incident. The court notes that if Dr. Morgan believed the question posed by Waters referenced a suicide attempt occurring after the incident, there is no support in the record to substantiate such a query. Further, if the question asked by Waters assessed Dr. Morgan's knowledge of a post-incident suicide attempt by Petitioner, the PCR judge's ruling remains unaffected as it leaves Dr. Morgan's awareness of an alleged suicide attempt by Petitioner prior to the incident unaddressed. In this circumstance, the testimony of Cummings and Stokes that they informed Dr. Morgan of Petitioner's purported suicide attempt prior to the incident would be uncontradicted, thus leading the PCR judge to the same conclusion.

3:05-cv-01595-MBS     Date Filed 02/28/06     Entry Number 18     Page 25 of 32

not to offer at sentencing evidence of the applicant's mental health was a strategic decision to avoid 'opening the door' to expert testimony regarding the applicant's 'malingering.'" Id. at 89 (App. 6519). The PCR judge noted the repeated expert opinions presented during the post conviction hearing that Petitioner was "malingering" and recognized that "if defense counsel introduced evidence of the applicant's purported suicide attempt at sentencing, the state would have introduced rebuttal evidence that [Petitioner] was malingering." Id. "In that event," the PCR court stated, "the jury would have before it for consideration not only the horrible nature of the crime committed and the state's aggravating evidence, but also the issue of whether [Petitioner] was trying to avoid responsibility for his actions by feigning a psychological disorder." Id. at 89-90 (App. 6519-20).

The PCR court also noted that "even if counsel were deficient in failing to present evidence of Petitioner's alleged suicide attempt . . . , [Petitioner] has failed to meet his burden of proving he was prejudiced by their deficient performance." Id. at 90 (App. 6520). This conclusion followed the PCR judge's recognition that because the sentencing jury was already "aware of . . . [Petitioner's] depression," the impact of Petitioner's alleged suicide attempt was lessened. Id. at 91 (App. 6521). The PCR judge noted that there was a danger to Petitioner that testimony regarding the suicide attempt would lead to "rebuttal evidence of [Petitioner's] 'malingering' that would have been devastating to the defense." Id. Consequently, the judge held that "[Petitioner] has failed to meet his burden of proving that there is a reasonable probability that, absent the errors allegedly made by counsel, [Petitoner's] jury would have concluded that the consideration of aggravating and mitigating circumstances did not warrant death." Id.

The court has reviewed the PCR judge's ruling on the alleged failure to provide effective assistance of counsel by failing to present evidence of Petitioner's alleged suicide attempt. The court

notes that the PCR judge correctly identified the established federal law on the subject and reasonably applied it to the instant facts. The court finds that the PCR judge's ruling that Petitioner was not denied effective assistance of counsel when counsel failed to present evidence of Petitioner's alleged suicide attempt neither was contrary to, nor involved an unreasonable application of, clearly established federal law. See 28 U.S.C. § 2254(d). The decision was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Id. Accordingly, Petitioner's objection is denied.

## B. Ground W: Violations of Brady and Giglio

Petitioner next challenges the Magistrate Judge's recommendation to dismiss Petitioner's claim that the failure of the State solicitor to correct allegedly false testimony of a witness violated established law and requires a new trial. Objections, 13 (citing Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963); Kyles v. Whitley, 514 U.S. 419, 437 (1995)).

Demond Jones is a convicted felon who assisted Petitioner in perpetrating the robbery by purchasing a rifle for him. Jones' role in the incident was summarized by the Supreme Court of South Carolina:

> The SKS rifle [used in the murder] was traced to Demond Jones ("Jones"), Shuler's cousin's fiancé. Since Jones was a convicted felon, it was illegal for him to purchase a SKS, and he was arrested on federal firearm charges. Jones testified he agreed to buy the SKS from Woody's Pawn Shop for Shuler in order to satisfy a debt he owed Shuler for a Cadillac. A week after the purchase, Shuler asked Jones to stand guard while he robbed an armored car in Harleyville. Shuler offered Jones a .44 pistol and $5,000 to help in the robbery. Jones refused.

Shuler, 545 S.E.2d at 809.

Because Jones was a convicted felon, he was charged with federal firearms violations

26

stemming from the purchase of the weapon.  Transcript of Trial Proceedings, 1458 (App. 742).

Prior to Petitioner's trial, Jones entered into a plea agreement with the United States government and

was sentenced to forty-one months incarceration.  Id. at 1459 (App. 743).

At issue is the prosecution's failure to respond to Jones' answers to a series of questions

posed by Cummings.  Specifically, Petitioner challenges the following:

> Q (by Cummings): You signed a plea agreement with the United States Government . . . . I want you to please take a look at it and see if you can identify it?
>
> A (by Jones): Yes, sir.
>
> . . . .
>
> Q: They made everything, put down in writing, didn't they?
>
> A: Yes, sir.
>
> Q: They agreed to drop certain counts of the indictment, certain charges, everything else if you agreed to come to this courtroom today and testify as you're testifying, right?
>
> A: Right.
>
> Q: Okay.  And I'm asking you under oath this morning: Were you not told by either the United States Attorney or your lawyer, Mr. Haley, that if you testified here they would have the right to come back and seek a reduction under the rules of federal court for you if you testified in this hearing today?
>
> A: No.
>
> Q: They did not tell you that?
>
> A: I ain't promised nothing.
>
> . . . .
>
> Q: Are you as sure of that last statement that you just gave this Court and these good jurors as you are about every other item you testified about this morning already?
>
> A: I wasn't promised anything.

Transcript of Trial Proceedings, 1490-91 (App. 774-75).

Petitioner claims that the above testimony of Jones was contrary to the contents of his plea agreement and that the prosecution's failure to correct this misstatement constituted a violation of Giglio and Brady. The court disagrees.

Due process requires disclosure by the prosecution, upon motion of a defendant, of evidence that would be favorable to the defendant and which is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 87, (1963). Evidence that may be used to impeach a witness's credibility is favorable to an accused under Brady. Giglio v. United States, 405 U.S. 150, 154-55 (1972). Evidence is material when there is a reasonable probability that the result of trial would have been different had the evidence been disclosed to the defense. United States v. Bagley, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles v. Whitley, 514 U.S. 419, 434 (1995). "A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" Id. (quoting Bagley, 473 U.S. at 678).

In his order, the PCR judge quoted the language of the plea agreement that stated, among other things, if Jones "cooperates . . . and that cooperation is deemed to be substantial assistance in the investigation or prosecution of another person . . . the Attorneys for the government agree to move the Court to depart from the United States Sentencing Commission Guidelines . . . ." Order Denying Post Conviction Relief, 111 (App. 6541). As the PCR judge noted, "[although] repeatedly referred to by both the prosecution and defense counsel at the applicant's trial and even shown to

28

Demond Jones by Cummings, the record reflects that [the plea] agreement was never formally introduced into evidence." Id.

The PCR judge noted that "although Jones' testimony seem[ed] contrary to the plea agreement's language . . . , Jones seemed confused as to whether the question pertained to a promise of a sentence reduction or the possibility of a sentence reduction." Id. at 112 (App. 6541). However, notwithstanding a reference in a footnote that "Jones simply did not understand both the question posed by defense counsel and possibly the agreement itself," the PCR judge recognized correctly that Jones' testimony was "technically false" and thus worthy of review under Giglio and Brady. Id.

The PCR judge properly summarized the applicable case law and found that the disputed evidence was immaterial. He noted that the jury was "fully aware that Demond Jones entered into a plea agreement with the government in exchange for Jones' testimony at [Petitioner's] trial." Id. at 115 (App. 6545). The PCR judge found that the "record reflects that Jones' credibility was vehemently attacked by defense counsel and sufficiently impugned." Id. The PCR judge referenced the opinion of the South Carolina Supreme Court on the subject of Jones' cross-examination:

> On cross examination, defense counsel repeatedly asked Jones if he made a deal with the United States attorney for his testimony at trial. Defense counsel's cross examination was extensive and focused on Jones' legal troubles and deals with law enforcement. The cross examination effectively impeached Jones by demonstrating he had incentive to testify in order to cut time off of his sentence. Defense counsel characterized Jones' deal with law enforcement as "selling his soul" and "receiving a little carrot" from the State. . . . Defense counsel's cross examination successfully impugned Jones' character by: (1) eliciting Jones had repeatedly spoken with State and federal police officers, but refused to talk with defense investigators; (2) showing Jones was on probation for assault and battery with the intent to kill when he was arrested on federal charges, and he had not had a State probation revocation hearing; (3) demonstrating Jones admitted lying on his federal firearms application for the SKS rifle; and (4) demonstrating Jones had not been charged by the Solicitor in connection with this case, and had not been charged with lying to the F.B.I.

29

Shuler, 545 S.E. 2d at 628 (responding to Petitioner's challenge on direct appeal that the trial court erred by allowing the State to use the plea agreement to bolster testimony by Jones).  Accordingly, the PCR judge ruled that "the 'technically false' testimony of Jones relating to the promise of a *non-binding* motion for a sentence reduction would not likely have affected the jury's verdict of guilty or not guilty nor does it undermine [the PCR court's] confidence in the verdict's outcome."  Order Denying Post Conviction Relief, 115-16 (App. 6545-46) (emphasis in original).

Similarly, with regard to the claim that the defense was improperly informed that Jones allegedly received a "say" in the location of his incarceration in exchange for his testimony,  the PCR judge determined that based on "the overwhelming amount of evidence against [Petitoner] and defense counsel's extensive attack on Jones' credibility . . . , such information, even if disclosed, would not undermine [the PCR judge's] confidence in the outcome of [Petitioner's] trial."  Id. at 119 (App. 6549).  Further, any alleged withholding of information regarding the "state's alleged failure to disclose evidence of [] Jones' alleged drug abuse and/or mental illness and deals as to Jones' probation . . . was not such that would affect the jury's decision or deprive [Petitioner] of a fair trial."  Id. at n. 33.

In his objections, Petitioner admonishes the court to "[r]emember Jones was the only one to put the guard in the back of the truck and give testimony about the robbery plans and the guns involved." Objections, 15.  To the contrary, as the PCR judge noted, "Jones' testimony was not the only evidence  presented to refute [Petitioner's] statement that the applicant did not know Brooks was in the back of the van."  Order Denying Post Conviction Relief, 116 (App. 6546).  The PCR judge proceeded to recount the myriad of testimony and evidence, other than Jones', establishing that Petitioner was aware that Brooks would be in the back of the vehicle and establishing that Petitioner

needed "sufficient firepower" to complete the robbery.  Id. at 117 (App. 6547).  For example, a review of the transcript reveals the testimony of Special Agent Espie, who stated that Petitioner informed him:

> [T]he .25 caliber was not sufficient firepower to commit such an act. [Petitioner] knowing there would be armed guards on the armored car.  So he obtained the assistance of a friend of his, Demond Jones, also known as Gerald Jones, to purchase a rifle . . . .

Transcript of Trial Proceedings, 2179 (App. 1463).  The record also indicates that Petitioner previously worked for the armored car service that he robbed and, while employed, participated in the "drop off or pick up of money" when a guard was in the back of the vehicle.  See  Transcript of Trial Proceedings, 1512, 1515, 1519 (App. 796, 799, 803) (indicating that Petitioner, on July 15, 1997 and July 16, 1997, rode in the front seat of an armored car while the decedent, Mr. Brooks, was serving as a guard in the back).  Accordingly, Petitioner has not overcome the presumption of correctness afforded the determination of factual issued made by the State court.  See  28 U.S.C. § 2254(e)(1).

After reviewing the PCR judge's decision that the "technically false" testimony permitted to go uncorrected was immaterial, the court cannot say that the state court unreasonably applied the Giglio and Brady principles to the facts presented.  Accordingly, the court concludes that the PCR judge's ruling that Petitioner was not denied his due process rights under the constitution as delineated in Giglio, Brady, and Kyles with respect to this matter neither was contrary to, nor involved an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C. § 2254(d).  Petitioner's final objection is without merit.

## III.  CONCLUSION

The court adopts the Report and Recommendation of Magistrate Judge and incorporates it herein by reference.  For the reasons stated in this order and in the Report and Recommendation of Magistrate Judge, Respondents' motion for summary judgment is **granted** and the within petition for writ of habeas corpus is dismissed with prejudice.  Because Petitioner has not satisfied the requirements of 28 U.S.C. § 2254(e), the court declines to hold an evidentiary hearing.

**IT IS SO ORDERED.**

/s/ Margaret B. Seymour
Margaret B. Seymour
United States District Judge

Columbia, South Carolina
February 28, 2006.